**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

STATE OF CALIFORNIA,
　　　　　　　　　　*Plaintiff,*
　　　　　and

STEVE POIZNER,* as Insurance
Commissioner of the State of
California and as Conservator,
Liquidator and Rehabilitator of the
ESTATE OF EXECUTIVE LIFE
INSURANCE COMPANY,
　　　*Plaintiff-counter-defendant-*
　　　　　　　　　*Appellant,*

　　　　　　v.

ALTUS FINANCE S.A., a corporation
organized under French law; CDR
ENTERPRISES, a corporation
organized under French law;
CREDIT LYONNAIS S.A., a
corporation organized under
French law; JEAN-CLAUDE SEYS, an
individual; JEAN FRANCOIS HENIN,
an individual; JEAN IRIGOIN, an
individual; ALAIN MALLART;
NOVATEC, e/s/a SDI VEDNOME S.A.;

No. 06-55297

D.C. No.
CV-99-02829-AHM

---

*Pursuant to Rule 43(c)(2) of the Federal Rules of Appellate Procedure, Steve Poizner is substituted for John Garamendi as Plaintiff-counter-defendant-Appellant.

11617

CONSORTIUM DE REALISATION S.A.,
a corporation organized under
French law; MAAF ASSURANCES, a
mutual insurer organized under
French law; MAAF VIE S.A., a
corporation organized under
French law,

*Defendants,*

and

ARTEMIS S.A., a corporation under
French law; ARTEMIS FINANCE
S.N.C., an entity d/b/u French law;
ARTEMIS AMERICA; FRANCOIS
PINAULT,

*Defendants-counter-claimants-*
*Appellees.*

STATE OF CALIFORNIA,

*Plaintiff,*

and

STEVE POIZNER, as Insurance
Commissioner of the State of
California and as Conservator,
Liquidator and Rehabilitator of the
ESTATE OF EXECUTIVE LIFE
INSURANCE COMPANY,

*Plaintiff-counter-defendant-*
*Appellee,*

v.

No. 06-55379

D.C. No.
CV-99-02829-AHM

ALTUS FINANCE S.A., a corporation organized under French law; CDR ENTERPRISES, a corporation organized under French law; CREDIT LYONNAIS S.A., a corporation organized under French law; JEAN-CLAUDE SEYS, an individual; JEAN FRANCOIS HENIN, an individual; JEAN IRIGOIN, an individual; ALAIN MALLART; NOVATEC, e/s/a SDI VEDNOME S.A.; CONSORTIUM DE REALISATION S.A., a corporation organized under French law; MAAF ASSURANCES, a mutual insurer organized under French law; MAAF VIE S.A., a corporation organized under French law,

*Defendants,*

ARTEMIS FINANCE S.N.C., an entity d/b/u French law; ARTEMIS AMERICA; FRANCOIS PINAULT,
    *Defendants-counter-claimants,*

and

ARTEMIS S.A., a corporation under French law,
    *Defendant-counter-claimant-*
                *Appellant.*

STATE OF CALIFORNIA,

*Plaintiff,*

and

STEVE POIZNER, as Insurance
Commissioner of the State of
California and as Conservator,
Liquidator and Rehabilitator of the
ESTATE OF EXECUTIVE LIFE
INSURANCE COMPANY,

*Plaintiff-counter-defendant,*

v.

ALTUS FINANCE S.A., a corporation
organized under French law; CDR
ENTERPRISES, a corporation
organized under French law;
CREDIT LYONNAIS S.A., a
corporation organized under
French law; JEAN-CLAUDE SEYS, an
individual; JEAN FRANCOIS HENIN,
an individual; JEAN IRIGOIN, an
individual; ALAIN MALLART;
NOVATEC, e/s/a SDI VEDNOME S.A.;
CONSORTIUM DE REALISATION S.A.,
a corporation organized under
French law; MAAF ASSURANCES, a
mutual insurer organized under
French law; MAAF VIE S.A., a
corporation organized under
French law,

*Defendants,*

No. 06-55391

D.C. No.
CV-99-02829-AHM

OPINION

ARTEMIS FINANCE S.N.C., an entity
d/b/u French law; ARTEMIS
AMERICA; FRANCOIS PINAULT,
        *Defendants-counter-claimants,*

                and

ARTEMIS S.A., a corporation under
French law,
        *Defendant-counter-claimant-
                        Appellee,*

                v.

NATIONAL ORGANIZATION OF LIFE
AND HEALTH INSURANCE GUARANTY
ASSOCIATIONS; CALIFORNIA LIFE AND
HEALTH INSURANCE GUARANTEE
ASSOCIATION,
        *Plaintiff-intervenors-Appellants.*

Appeal from the United States District Court
for the Central District of California
A. Howard Matz, District Judge, Presiding

Argued and Submitted
December 5, 2007—Pasadena, California

Filed August 25, 2008

Before: Thomas G. Nelson, Richard A. Paez, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee

## COUNSEL

Kevin Russell, Howe & Russell, P.C., Washington, D.C.; Gary L. Fontana and Jennifer R. McGlone, Thelen Reid & Priest, LLP, San Francisco, California, for the appellant/cross-appellee.

James P. Clark, Gibson, Dunn & Crutcher, LLP, Los Angeles, California; Robert L. Weigel, Gibson, Dunn & Crutcher, LLP, New York, New York, for the appellee/cross-appellant.

Cindy C. Oliver and Craig R. Welling, Rothberger, Johnson & Lyons, LLP, Denver, Colorado, for the intervenors-appellants.

## OPINION

BYBEE, Circuit Judge:

This litigation arises from the 1991 insolvency and subsequent rehabilitation of the Executive Life Insurance Company (ELIC), following the largest insurance failure in California history. Pursuant to a judicially supervised rehabilitation plan, Insurance Commissioner John Garamendi[1] (the Commis-

---

[1]John Garamendi served as Insurance Commissioner from 1991-1995 and again from 2003-2007. Steve Poizner succeeded him on January 8, 2007.

sioner) oversaw competitive bidding for the assets of the ELIC Estate, which included a large junk bond portfolio. Altus S.A., a subsidiary of Credit Lyonnais S.A., which is controlled by the French government, and the MAAF Group, a consortium of French and Swiss insurers, submitted the winning bid. Altus purchased the junk bond portfolio for cash, and the MAAF Group agreed to create a new company to reinsure ELIC's outstanding insurance policies. Artemis S.A., a holding company controlled by Francois Pinault, subsequently purchased a percentage of that junk bond portfolio and the newly formed insurance company.

The rehabilitation plan was a resounding success. The Commissioner proclaimed the rehabilitation of ELIC "by any objective standards a home run," resulting in a full recovery for 92 percent of the insolvent insurer's former policy holders. The rehabilitation was also a home run for Artemis, which earned hundreds of millions of dollars in profit from appreciation of the ELIC Estate's junk bond portfolio.[2]

In 1999, however, years after the rehabilitation plan had been implemented, the Commissioner learned of a conspiracy between the members of the Altus/MAAF Group to circumvent regulatory barriers to foreign entities, like Altus, from issuing insurance in California.[3] The Commissioner filed this

---

[2]*See, e.g.*, Vicky Ward, *Francois Pinault's Ultimate Luxury*, VANITY FAIR, December 2007, at http://www.vanityfair.com/culture/features/2007/12/pinault200712.

[3]Discovery of the Altus/MAAF Group conspiracy generated voluminous litigation. *See, e.g.*, *Watson v. Garamendi*, 262 Fed. Appx. 805 (9th Cir. 2008); *Cal. ex rel. RoNo, LLC v. Altus Fin., S.A.*, 344 F.3d 920 (9th Cir. 2003); *Carranza-Hernandez v. Artemis, S.A.*, 34 Fed. Appx. 593 (9th Cir. 2002); *Carranza-Hernandez v. Altus Fin. Corp.*, 33 Fed. Appx. 364 (9th Cir. 2002); *Low v. Altus Fin. S.A.*, 44 Fed. Appx. 282 (9th Cir. 2002); *AIG Retirement Services, Inc. v. Altus Fin. S.A.*, 2007 WL 5362724 (C.D. Cal. May 31, 2007); *Garamendi v. SDI Vendome S.A.*, 276 F. Supp. 2d 1030 (C.D. Cal. 2003); *Low v. SDI Vendome S.A.*, 2003 WL 25678880 (C.D. Cal. 2003); *Low v. Altus Fin., S.A.*, 136 F. Supp. 2d 1113 (C.D. Cal. 2001); *Sierra Nat'l Ins. Holdings, Inc. v. Altus Fin., S.A.*, 2001 WL 1343855 (C.D. Cal. June 20, 2001); *State v. Altus Fin., S.A.*, 36 Cal. 4th 1284 (2005).

civil suit against the members of the Altus/MAAF Group, Artemis, and Pinault, alleging intentional misrepresentation, concealment and conspiracy to defraud. The Altus/MAAF Group defendants settled or defaulted on the claims. The case proceeded to a bifurcated jury trial against Artemis and Pinault. The National Organization of Life and Health Insurance Guaranty Associations (NOLHGA) intervened to protect its interests as a losing bidder for the assets of the ELIC Estate.

After a nine-week liability phase trial, the jury found Artemis liable for conspiracy only and exonerated Pinault. The jury was unable to answer a special verdict form posing the Commissioner's principal theory of damages—that but for the Altus/MAAF Group conspiracy, the Commissioner would have selected the NOLHGA bid. The district court entered a Post-Verdict Order barring proffer of that theory in the damages phase of trial. The Commissioner presented two alternate theories of damages, and the jury awarded the Commissioner $0 in compensatory damages and $700 million in punitive damages. In an Order Re Punitive Damages, the district court vacated the punitive damages award. The court made findings of fact on the Commissioner's equitable claims and awarded him $241 million in restitution.

Parties on both sides appealed the judgment. The Commissioner and NOLHGA challenge the Post-Verdict Order and Order Re Punitive Damages and request reinstatement of the $700 million punitive damages award. On cross-appeal, Artemis challenges the award of restitution and denial of its motion for summary judgment on res judicata grounds, arguing that the Commissioner's claims are an impermissible collateral attack on the judicially approved rehabilitation plan and that the Commissioner should take nothing. For the reasons explained below, we affirm the Order Re Punitive Damages and the denial of Artemis' motion for summary judgment. We reverse the Post-Verdict Order, vacate the

award of restitution, and remand to the district court for further proceedings.

## I

Executive Life Insurance Company became insolvent in 1991, due in part to losses on the company's large junk bond portfolio. Pursuant to California law, Insurance Commissioner John Garamendi became conservator of the ELIC Estate under the supervision of the Los Angeles County Superior Court (the Rehabilitation Court). The Commissioner developed a plan to rehabilitate ELIC, which contemplated a public auction of the assets and liabilities of the ELIC Estate to a new California insurance company that would reinsure ELIC's existing life insurance policies and annuity contracts at a guaranteed minimum percentage of their former value.

### A. *Altus/MAAF Group Conspiracy to Acquire ELIC's Assets*

After a competitive bidding process in October 1991, the Commissioner received eight bids, three of which merited full consideration: a joint bid by Altus Finance S.A. (Altus), a subsidiary of Credit Lyonnais S.A. that was controlled by the French government, and the MAAF Group, a consortium of French and Swiss insurance companies;[4] a bid from the National Organization of Life and Health Insurance Guaranty Associations; and a bid by Sierra National Insurance Holdings, Inc. (Sierra). The NOLHGA and Sierra bids were "bonds-in," meaning that the ELIC junk bond portfolio would remain in the rehabilitated insurance company. In contrast, the Altus/MAAF Group bid was "bonds-out": Altus would purchase the junk bond portfolio for cash, and the MAAF Group would manage the rehabilitated insurance company without

---

[4]The MAAF Group included the following entities: MAAF Assurance; MAAF Vie; Omnium Geneve; Financiere du Pacific; and SDI Vendome.

the risk associated with continued ownership of the junk bond portfolio.

On October 24, 1991, the Commissioner conditionally accepted the NOLHGA bid, but he identified several "serious legal issues" and "potentially grave problems" that NOLHGA would have to cure before its bid could be approved. NOLHGA responded to the Commissioner's demands on November 4, 1991; however, the Commissioner formally rejected the NOLHGA bid two days later, identifying numerous specific defects in the bid.

On November 12, 1991, Sierra submitted a Memorandum to the Commissioner, asserting that it had reason to believe that Credit Lyonnais and Altus maintained actual control of the MAAF Group in violation of California Insurance Code Section 699.5. In 1991, Section 699.5 prohibited entities controlled by foreign governments, like Credit Lyonnais and Altus, from obtaining certificates of authority from the Department of Insurance to conduct business in California.[5] In response to the Memorandum, the Commissioner requested assurances from Credit Lyonnais and Altus that they did not in fact maintain secret control over the MAAF Group. The Commissioner received those assurances and conducted no further investigation.

---

[5]In 1991, Section 699.5(a) provided: "Except as provided by subdivision (b), a certificate of authority shall not issue to any insurer owned, operated, or controlled, directly or indirectly, by any other . . . nation or any governmental subdivision or agency thereof." In 1994, the California legislature repealed that general prohibition on foreign ownership of California insurers. Section 699.5(a) now provides: "The ownership or financial control, in part, direct or indirect, of any . . . foreign . . . insurer . . . or . . . foreign government . . . , shall not, provided the insurer complies with all other requirements for issuance, renewal, or continuation of a license, restrict the commissioner from issuing, renewing, or continuing in effect the license of that insurer to transact in this state the kinds of insurance business for which that insurer is otherwise qualified . . . ."

In fact, however, Altus had entered into a conspiracy with the members of the MAAF Group to circumvent the prohibition on foreign control of California insurers in Section 699.5. Altus and the MAAF Group agreed to bid for the assets of the ELIC Estate with the understanding that the MAAF Group would organize and appear to own New California Life Holdings (NCLH), a newly formed corporation that would reinsure ELIC insurance policies. The MAAF Group, however, would operate NCLH for the benefit of Altus, not its members. The terms of the secret agreements were memorialized in French-language *contrats de portage*.

On November 14, 1991, the Commissioner determined that a revised $3.25 billion cash bid from the Altus/MAAF Group was superior to the Sierra bid and recommended selection of the Altus/MAAF Group bid to the Rehabilitation Court. The next day, Altus and MAAF executed a Management Agreement that obligated MAAF, in its capacity as a shareholder of NCLH, "to act on behalf of Altus . . . and as its agent to help it to implement its strategic decisions." Altus and MAAF agreed not to disclose the agreement to third parties.

On December 26, 1991, the Rehabilitation Court approved the Altus/MAAF Group bid, and the sale of the assets of the ELIC Estate was formalized in a written contract entered between the Commissioner and the Altus/MAAF Group (the Rehabilitation Plan). Under the terms of that contract, ELIC insurance policies assets would be transferred to a new insurance company, Aurora National Life Assurance Company (Aurora), a subsidiary of NCLH controlled by the MAAF Group. Third parties challenged the sale in the Rehabilitation Court. The Commissioner advised the Rehabilitation Court that the ELIC Estate's continued ownership of the junk bond portfolio would jeopardize the security of existing ELIC policies because of the risk associated with those junk bonds. In order to expedite the sale of the junk bonds, the Commissioner requested that the Rehabilitation Court sever the sale of the junk bond portfolio from the sale of the ELIC Estate's

insurance assets. On February 18, 1992, the Rehabilitation Court granted the Commissioner's request. After accepting bids from third parties, the Rehabilitation Court approved the sale to Altus, the highest bidder, for approximately $3.25 billion in cash.

In May 1992, the California Department of Insurance (DOI) issued a certificate of authority to Aurora, allowing it to operate as a life insurance company in California. On August 13, 1993, the Rehabilitation Court approved the Rehabilitation Plan and denied motions to rescind the sale of ELIC's junk bond portfolio to Altus. ELIC's insurance policies were transferred to Aurora in September 1993.[6] Aurora subsequently brought a tax indemnity claim against the ELIC Estate, which the Commissioner settled for $75 million.

B.  *Artemis' Acquisition of Altus/MAAF Group's Interest in ELIC's Assets*

Artemis did not exist at the time Altus/MAAF Group bid for the assets of the ELIC Estate. Artemis was formed in December 1992 as a joint venture between Altus and Financiere Pinault, a French corporation controlled by Francois Pinault. Under the terms of the agreement, Altus owned 24.5 percent of Artemis, and Financiere Pinault owned 75.5 percent. Francois Pinault became the Chairman of the joint venture. On December 24, 1992, Artemis, Altus and Credit Lyonnais signed a contract under which Altus sold Artemis approximately 21 percent of the ELIC junk bond portfolio, which Altus had acquired nine months earlier. Artemis also acquired an option to purchase Altus' interest in Aurora. Arte-

---

[6]The Rehabilitation Plan was subject to extensive litigation in California courts. *See, e.g.*, *In re Executive Life Ins. Co.*, 32 Cal. App. 4th 344 (1995); *Garamendi v. Executive Life Ins. Co.*, 17 Cal. App. 4th 504 (1993); *Commercial Nat'l Bank v. Superior Court*, 14 Cal. App. 4th 393 (1993); *Texas Commerce Bank v. Garamendi*, 11 Cal. App. 4th 460 (1992).

mis subsequently exercised that option and obtained approval from the DOI to acquire a controlling interest in NCLH and its subsidiary Aurora from the MAAF Group.

In 1992 or 1993, Artemis learned of the Altus/MAAF Group's conspiracy to evade the prohibition in Section 699.5 on foreign entities controlling California insurers. Artemis did not disclose the conspiracy to the Commissioner. On multiple occasions, Artemis submitted Form A applications to DOI that contained false or misleading information regarding both Artemis' own interest in Aurora through its option contract and Altus's secret control of Aurora through the *contrats de portage* with the MAAF Group.

C. *Commissioner's Complaint and NOLHGA's Intervention*

In January 1999, nearly seven years after the sale of the junk bond portfolio and issuance of the certificate of authority, the Commissioner learned of the Altus/MAAF Group conspiracy. Within weeks, in February 1999, the Commissioner sued in California state court, alleging state law claims against Credit Lyonnais, Altus, MAAF Group corporations, and senior officers of Altus and MAAF Group corporations. In February 2000, the Commissioner filed an amended complaint, adding four more defendants: Artemis, Aurora, NCLH, and Francois Pinault. NOLHGA intervened as a plaintiff to protect its interests as a losing bidder for the assets of the ELIC Estate.

Artemis' former co-defendants removed the suit to federal district court. Before trial, the Commissioner settled his claims against Credit Lyonnais and Altus for $600 million and his claims against Aurora and NCLH for $80 million. Default judgments were taken against the MAAF Group defendants and several French nationals, leaving only Artemis and Pinault in the suit. Artemis filed a motion for summary judgment on res judicata grounds, arguing that the Commissioner was barred by the Rehabilitation Court's approval of

the Rehabilitation Plan. The district court denied that motion, and the case proceeded to trial against Artemis and Pinault. The Commissioner asserted legal claims for intentional misrepresentation, fraudulent concealment and conspiracy to commit fraud and equitable claims for unjust enrichment, constructive trust and accounting. The district court bifurcated the trial into a liabilities phase and a damages phase.

D.  *Jury Verdicts, Post-Trial Orders and Equitable Relief*

On May 10, 2005, after nine weeks of evidence in the liability phase of the trial, the jury returned seven special verdict forms. The jury exonerated Pinault on all claims (Forms 2, 4, and 6). The jury found that Artemis made false representations to and concealed important facts from the Commissioner, but that the misrepresentation and concealment were not a substantial factor in causing harm to the ELIC Estate (Forms 1 and 3). The jury found that Artemis joined the Altus/MAAF Group conspiracy and that the conspiracy caused harm to the ELIC Estate (Form 5). The jury deadlocked on Form 7, which posed what was referred to as the "NOLHGA Premise": "Did the Commissioner prove that, but for the misrepresentation, concealment or conspiracy that led to your answers to previous questions, he probably would have entered into a transaction with NOLHGA for the benefit of the ELIC Estate?" The district court delivered an *Allen* charge;[7] however, the jury informed the court that it remained "hopelessly deadlocked" on the NOLHGA Premise.

On June 10, 2005, the district court entered a Post-Verdict Order reconciling the verdicts. The district court found that Artemis was not legally liable for intentional misrepresentation or concealment because the jury found that neither

---

[7] The term "*Allen* charge" is the generic name for a class of supplemental jury instructions given when jurors are apparently deadlocked; the name derives from the Supreme Court's approval of such an instruction in *Allen v. United States*, 164 U.S. 492, 501-02 (1896).

caused harm to the ELIC Estate, but that Artemis was liable for participating in the Altus/MAAG Group conspiracy, which the jury found did harm the ELIC Estate. The court construed the jury's inability to return a verdict on Form 7 as a failure of proof and prohibited the Commissioner from proffering evidence in support of the NOLHGA Premise in the damages phase of trial.

On July 21, 2005, the jury returned two verdict forms after hearing a week of evidence in the damages phase. The jury awarded the Commissioner "$0" in compensatory damages and $700 million in punitive damages. On October 3, 2005, the district court entered an Order Re Punitive Damages, invalidating the punitive damages award under California law and the Due Process Clause. The district court then heard the Commissioner's equitable claims and awarded him $241 million in restitution on February 13, 2006. The district court denied Artemis' motion to offset that award against settlements made by Artemis' co-defendants. The Commissioner and NOLHGA timely appealed. Artemis cross-appealed.

II

A.   *Order Re Punitive Damages*

The Commissioner and NOLHGA appeal the district court's Order Re Punitive Damages, which vacated the jury's award of $700 million in punitive damages. The Commissioner presented two theories in the damages phase of trial: first, the ELIC Estate would not have paid $75 million to settle an indemnity claim brought by Aurora because the Commissioner would have selected a "bonds-in" bid but for the Altus/MAAF Group conspiracy; and second, the ELIC Estate would have profited from the recovery of its junk bond portfolio had it not lost the opportunity to rescind the sale of that portfolio to Altus as a result of the Altus/MAAF Group conspiracy. After hearing a week of evidence, the jury returned two verdicts. In Damages Verdict Form A, the jury awarded

the Commissioner "$0" in compensatory damages under each of the Commissioner's damages theories. In Damages Verdict Form B, the jury awarded the Commissioner $700 million of punitive damages, finding that Artemis "participat[ed] in the conspiracy or scheme that caused harm to the Commissioner," and that Artemis "acted with malice, oppression, or fraud." The district court vacated the punitive damages award under California law and the Due Process Clause.

We review the district court's interpretation of California law and its determination of the constitutionality of punitive damages *de novo. See Cooper Indus. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436 (2001); *Rabkin v. Or. Health Scis. Univ.*, 350 F.3d 967, 970 (9th Cir. 2003). "Exacting appellate review ensures that an award of punitive damages is based upon an application of law, rather than a decision-maker's caprice." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (internal quotation marks omitted); *In re Exxon Valdez*, 270 F.3d 1215, 1239 (9th Cir. 2001) ("[A] hands-off appellate deference to juries, typical of other kinds of cases and issues, is unconstitutional for punitive damages awards.") (citing *Honda Motor Co. v. Oberg*, 512 U.S. 415, 432 (1994)).

**[1]** Under California law, "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." CAL. CIV. CODE § 3294(a). California courts have long interpreted Section 3294 to require an award of compensatory damages, even if nominal, to recover punitive damages. As the California Supreme Court has stated:

> The foundation for the recovery of punitive or exemplary damages rests upon the fact that substantial damages have been sustained by the plaintiff. Punitive damages are not given as a matter of right, nor

can they be made the basis of recovery independent of a showing which would entitle the plaintiff to an award of actual damages. Actual damages must be found as a predicate for exemplary damages. This is the rule announced in many authorities.

*Mother Cobb's Chicken Turnovers, Inc. v. Fox*, 10 Cal. 2d 203, 205 (1937). (internal quotation marks and citation omitted); *see, e.g.*, *Kizer v. County of San Mateo*, 53 Cal. 3d 139, 147 (1991) ("In California, as at common law, actual damages are an absolute predicate for an award of exemplary or punitive damages."); *Sole Energy Co. v. Petrominerals Corp.*, 128 Cal. App. 4th 212, 238 (2005) ("An award of actual damages, even if nominal, is required to recover punitive damages."); *Cheung v. Daley*, 35 Cal. App. 4th 1673, 1677 (1995) (invalidating punitive damages award where jury awarded $0 compensatory damages); *Jackson v. Johnson*, 5 Cal. App. 4th 1350, 1357-58 (1992) (invalidating punitive damages award where the jury "assess[ed] damages in the sum of *0 dollars*.").

**[2]** Although the numbers in this case are breathtaking, California law is well-established and quite clear. Where the jury here explicitly found "$0" of compensatory damages, the general rule precludes punitive damages. *See Mother Cobb's Chicken Turnovers, Inc.*, 10 Cal. 2d at 206. The $0 figure assessed by the jury is striking because the district court clearly instructed the jury on the availability of nominal damages: "If you find for the plaintiff but you find that the plaintiff has failed to prove damages as defined in these instructions, you must award nominal damages." The jury explicitly declined to award nominal damages, instead awarding "$0" compensatory damages as urged by counsel for Artemis. The California rule that might authorize $700 million in punitive damages if the jury awards $1, but no punitive damages if the jury awards nothing, may seem harsh. But the rule is no less a rule when it prohibits large punitive awards than when it prohibits much smaller punitive awards. And, more-

over, the rule is clear—unless the jury awards at least nominal damages, a plaintiff may not recover punitive damages.

The Commissioner and NOLHGA argue that, notwithstanding the clarity of the jury's award of "$0" in compensatory damages, the Commissioner established sufficient harm in other ways to satisfy the predicate of actual damages necessary to sustain the jury's $700 million punitive damages award. They offer two theories: (1) the jury found that Artemis' participation in the Altus/MAAF Group's conspiracy caused harm to the ELIC Estate in Form 5 in the liability phase of trial; and (2) the district court subsequently awarded the Commissioner $241 million in restitution based in part on Artemis' participation in the Altus/MAAF Group conspiracy.

### 1. *Finding of Harm in Verdict Form 5*

The Commissioner argues that a finding of injury, not an award of compensatory damages, is all that California law requires to sustain an award of punitive damages. *See Gagnon v. Cont'l Cas. Co.*, 211 Cal. App. 3d 1598, 1603 n.5 (1989) ("[A]n actual award of compensatory damages is not necessary; rather the plaintiff need only prove that he or she *suffered* damages or injury."). Here, in returning a verdict on Form 5, the jury expressly found that: (1) Altus agreed "to participate in a common scheme to obtain assets from the ELIC Estate by fraud" with the MAAF Group; (2) Artemis became aware of that common scheme; (3) Artemis agreed to participate with the Altus/MAAF Group "in furtherance of that scheme, knowing its wrongful objective and before the scheme was accomplished"; and (4) the scheme caused harm to the ELIC estate. The Commissioner contends that finding of "harm" satisfies the predicate of actual damages necessary to sustain the punitive damages award, irrespective of the jury's subsequent award of "$0" compensatory damages.

The Commissioner's reliance on *Gagnon* is misplaced. In *Gagnon*, the California Court of Appeal held that a plaintiff

who was statutorily ineligible to receive compensatory damages was nonetheless entitled to punitive damages reasonably related to actual harm suffered. 211 Cal. App. 3d at 1603-05. The Court of Appeal reaffirmed that "[i]t is settled that punitive damages cannot be awarded unless actual damages are suffered," *id.* at 1603 n.5, but noted that awarding punitive damages as a multiple of actual damages "becomes troublesome, if not unworkable, where, as here, the plaintiff is not entitled to an award of compensatory damages; or where the plaintiff obtains only equitable relief; or where the plaintiff recovers only nominal damages." *Id.* at 1604 (internal citations omitted). By shifting "the focus [to] the plaintiff's injury rather than the amount of compensatory damages, the rule can be applied even in cases where only equitable relief is obtained or where nominal damages are awarded or, as here, where compensatory damages are unavailable." *Id.* at 1605. The Commissioner has not persuaded us that the reasoning of *Gagnon* should extend to this case where compensatory damages, even nominal damages, were legally available and explicitly sought by the Commissioner.

**[3]** Further, the California Court of Appeal squarely foreclosed the Commissioner's argument in *Cheung v. Daley*, 35 Cal. App. 4th 1673 (1995). The issue presented in that case was "whether a jury can award exemplary damages when it has expressly determined that the plaintiffs were entitled to "0.00" compensatory damages." *Id.* at 1674. The Court of Appeal answered "No." *Id.* In *Cheung*, a jury found by special verdict that "the total amount of compensatory damages to which all Plaintiffs are entitled [was] $0.00," and that "in making the [fraudulent] transfers of [the two properties the defendant] acted with fraud, oppression or malice," for which the jury awarded plaintiffs exemplary damages of $92,000. *Id.* at 1675. The Court of Appeal reversed the punitive damages award:

> [T]he rule of *Mother Cobb's Chicken*—that an award of exemplary damages must be accompanied

by an award of compensatory damages—is still
sound. That rule cannot be deemed satisfied where
the jury has made an express determination not to
award compensatory damages.

*Id*. at 1677 (citing *Mother Cobb's Chicken Turnovers, Inc.*, 10
Cal. 2d at 205). Here, the jury's award of "$0" in compensa-
tory damages established that, notwithstanding the "harm"
found in Form 5, the Commissioner did not suffer the "actual
damages" necessary to sustain the jury's punitive damages
award.

### 2.   *Award of Restitution*

In the alternative, the Commissioner argues that the district
court's grant of restitution, awarded in equity, provides an
independent basis for upholding the jury's award of punitive
damages awarded in law. *See Ward v. Taggart*, 51 Cal. 2d
736, 743 (1959) (holding that "[exemplary] damages are
appropriate in cases . . . where restitution would have little or
no deterrent effect, for wrongdoers would run no risk of lia-
bility to their victims beyond that of returning what they
wrongfully obtained"); *see also Gagnon*, 211 Cal. App. 3d at
1604 (finding that awarding punitive damages as a multiple of
actual damages "becomes troublesome, if not unworkable,
where . . . the plaintiff obtains only equitable relief"). The
Commissioner's argument proves too much.

**[4]** In *Ward*, plaintiffs made offers of $4,000 and $5,000
per acre to purchase land. 51 Cal. 2d at 740. The defendant,
plaintiffs' real estate broker, had purchased the land secretly
at $4,000 per acre and then resold it to plaintiffs at $5,000 per
acre, retaining $1,000 per acre of profit. A jury awarded the
plaintiffs approximately $72,000 in compensatory damages
and $36,000 in exemplary damages. *Id*. The California
Supreme Court reversed the award of compensatory damages,
finding that the plaintiffs had suffered no "out-of-pocket"
damages because the fair market value of the land was at least

$5,000 per acre;[8] however, the court awarded the plaintiffs equitable relief of $1,000 per acre to prevent unjust enrichment of the defendant. *Id*. at 741-42 (citing CAL. CIV. CODE § 3517 ("No one can take advantage of his own wrong.")). The defendant argued that the award of exemplary damages could not stand absent an award of compensatory damages. The court held that the award of restitution provided a sufficient predicate to sustain the award of exemplary damages. It reasoned:

> Courts award exemplary damages to discourage oppression, fraud, or malice by punishing the wrongdoer. Such damages are appropriate in cases like the present one, where restitution would have little or no deterrent effect, for wrongdoers would run no risk of liability to their victims beyond that of returning what they wrongfully obtained.

*Id*. at 743 (internal citations omitted); *see also Topanga Corp. v. Gentile*, 249 Cal. App. 2d 681, 691 (1967) ("Exemplary damages are proper in cases involving fraud and are awarded to discourage the same by way of punishing the wrongdoer." (internal quotation marks and citations omitted)).

[5] *Ward* is distinguishable on two grounds. First, *Ward*, like *Gagnon*, is a case where the compensatory damages sought by the plaintiff were legally unavailable. Here, lost profit compensatory damages were legally available and

---

[8]At the time the California Supreme Court decided *Ward*, Civil Code Section 3343, addressing damages for fraud in the sale of property, allowed recovery of "out-of-pocket" losses only, not lost profits. *See Ward*, 51 Cal. 2d at 740. The California Legislature subsequently amended Section 3343 to permit recovery of lost profits for fraud in the sale of property, obviating the need for the Court's "ingenious innovation" of permitting a restitution award to satisfy the predicate for exemplary damages. *Id*. at 744 (Schauer, J., concurring and dissenting); *see also Channell v. Anthony*, 58 Cal. App. 3d 290, 308-18 (1976) (discussing the history of Section 3343 and applying that section as amended).

explicitly sought by the Commissioner, yet the jury declined to award even nominal compensatory damages. Second, the jury in *Ward* found that all of the elements of fraud, including harm, were proven against the defendant. Here, the jury found in Verdict Forms 1 and 3 that Artemis intentionally misrepresented and concealed material facts; however, it also found that neither the misrepresentation nor the concealment harmed the ELIC Estate. As a result, Artemis had no legal liability for its own misrepresentation or concealment.

[6] The Commissioner sought restitution based on the same record evidence of Artemis' intentional misrepresentation and concealment. The district court ultimately awarded restitution calculated to disgorge only a portion of the profit that the Commissioner sought as compensatory damages. Permitting the restitution award in this case to serve as a predicate for the jury's punitive damages award would cast doubt on the equity in the district court's award and would potentially result in a windfall to the Commissioner.[9] We conclude that California courts would not extend the reasoning of *Ward* to permit restitution to serve as the predicate for punitive damages where a defendant is not legally liable for fraud and a jury has expressly awarded "$0" in compensatory damages.

[7] We affirm the district court's Order Re Punitive Damages, vacating the jury's $700 million punitive damages award. Because the punitive damages award is invalid under California law, we decline to consider whether that award also violates the Due Process Clause.

---

[9]The Commissioner's suggestion would yield him some $941 million, vastly in excess of either the jury award or the district court's award of restitution. Realizing the dilemma his argument creates, the Commissioner concedes: "Because the punitive damages award rests on the same principles on which the district court awarded restitution, the Commissioner is willing to forego the restitution award if the jury's punitive damage[s] award is fully reinstated." Appellant Garamendi's Opening Brief at 36. The Commissioner's offer to substitute the punitive award for the restitutionary award puts the Commissioner into precisely the position he was in when the jury awarded him punitive damages in the first place.

## B.   *Post-Verdict Order*

The Commissioner and NOLHGA appeal the district court's Post-Verdict Order, which prohibited the Commissioner from proffering the NOLHGA Premise in the damages phase of the trial. They allege that the district court improperly reconciled the special verdict forms answered by the jury and improperly construed the jury's inability to answer Form 7 as a failure of proof with respect to the NOLHGA Premise. The Commissioner and NOLHGA argue that, properly reconciled, the verdict forms answered by the jury conclusively establish the NOLHGA Premise, rendering Form 7 superfluous. In the alternative, they request a limited remand for a new damages phase trial on the NOLHGA Premise.[10]

We review *de novo* the district court's reconciliation of the special verdict forms returned by the jury. *See Wilks v. Reyes*, 5 F.3d 412, 415 (9th Cir. 1993). "[T]he court must search for a reasonable way to read the verdicts as expressing a coherent view of the case . . . . The consistency of the jury verdict must be considered in light of the judge's instructions to the jury." *Toner v. Lederle Labs.*, 828 F.2d 510, 512 (9th Cir. 1987); *see Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 119 (1963). In reconciling answered verdict forms, no inference may be drawn from the jury's failure to answer a verdict form. *See Iacurci v. Lummus Co.*, 387 U.S. 86, 87-88 (1967) (per curiam). The court may properly enter judgment only if

---

[10]The Commissioner and NOLHGA opposed a mistrial after the liability phase of the trial, arguing instead that they should be permitted to proffer the NOLHGA Premise to the jury again in the damages phase. As a result, Artemis argues that the Commissioner and NOLHGA waived their right to seek a new trial on the NOLHGA Premise. We disagree. The Commissioner and NOLHGA preserved their arguments in bench briefs filed with the district court after the liabilities phase. In addition, the Commissioner filed a Writ of Mandamus with the Ninth Circuit, seeking reversal of the Post-Verdict Order, *Garamendi v. United States Dist. Ct.*, No. 05-73652 (9th Cir. June 27, 2005) (denying mandamus), and NOLHGA filed a motion for reconsideration of the Post-Verdict Order.

the answered verdict forms conclusively dispose of the issues submitted to the jury. *See Skyway Aviation Corp. v. Minneapolis Northfield and S. Ry. Co.*, 326 F.2d 701, 704 (8th Cir. 1964) ("The failure to agree on the unanswered interrogatory did not vitiate the otherwise unanimous verdict effectively disposing of the issues submitted."). If the answered verdict forms do not dispose of all the issues submitted to the jury, the court must either resubmit the unanswered verdicts to the same jury or declare a mistrial with respect to the unresolved issues. *See Union Pac. R.R. Co. v. Bridal Veil Lumber Co.*, 219 F.2d 825, 832 (9th Cir. 1955) ("To do other than send the case back for a new trial when decision on a vital issue by the jury is missing would deprive the parties of the jury trial to which they are entitled constitutionally."); *Loughridge v. Chiles Power Supply Co., Inc.*, 431 F.3d 1268, 1287-88 (10th Cir. 2005); *see also Duk v. MGM Grand Hotel, Inc.*, 320 F.3d 1052, 1058 (9th Cir. 2003) (holding that "when the jury is still available, resubmitting an inconsistent verdict best comports with the fair and efficient administration of justice").

By contrast, whether to enter judgment consistent with the answered verdict forms, to resubmit an unanswered verdict form to the same jury or to order a new trial with respect to the unresolved issues is within the discretion of the district court. *See Wilks*, 5 F.3d at 415; *Union Pac. R.R. Co.*, 219 F.2d at 831 ("[I]t is peculiarly the function of the trial judge to decide whether to discharge the jury or, within the limits of legitimate wheedling, try to get the jurors to agree on an answer."). Accordingly, we review the district court's Post-Verdict Order, exclusive of the verdict reconciliation, for abuse of discretion. *Id.*

After hearing nine weeks of evidence in the liabilities phase of the trial, the district court submitted the special verdict forms to the jury pursuant to Federal Rule of Civil Procedure 49(a). After three weeks of deliberation, the jury informed the district court that there was one verdict form on which it could not agree. The district court asked the jury whether it

considered the seven answered verdict forms final. The jury responded "yes" and delivered seven signed and sealed verdict forms. The district court then gave an *Allen* charge. The jury reported that it was "hopelessly deadlocked" on the remaining verdict form, and the district court unsealed and read the answered verdicts.

### 1. *Verdict Forms 1, 3, 5*

In Forms 1 and 3, the jury found that Artemis engaged in intentional misrepresentation and concealment, and that the Commissioner relied on that misrepresentation and concealment, but that Artemis's conduct did not harm the ELIC Estate. Without a finding of harm, the jury's answers to Forms 1 and 3 did not constitute complete findings of liability. In Form 5, the jury found that the Altus/MAAF Group entered a common scheme to defraud the Commissioner; that Artemis acted in furtherance of that scheme; and that the scheme caused harm to the ELIC Estate. The jury's answer to Form 5 constituted a complete finding of liability. As a result, the district court properly ordered a damages phase of trial, limited to quantification of any damages caused by the conspiracy found in Form 5.[11]

### 2. *Verdict Form 7*

The jury was unable to answer Form 7, which posed the NOLHGA Premise: "Did the Commissioner prove that, but for the misrepresentation, concealment or conspiracy that led to your answers to previous questions, he probably would have entered into a transaction with NOLHGA for the benefit

---

[11]In Forms 2 and 4 the jury found that Pinault did not make a false representation or intentionally fail to disclose an important fact to the commissioner; in Form 6 the jury found that Pinault did not know of the Altus/MAAF Group conspiracy to obtain assets from the ELIC Estate by fraud. The Commissioner has not appealed the judgment dismissing the claims against Pinault.

of the ELIC Estate?" Unlike Forms 1, 3, and 5, which presented the jury with theories of liability, Form 7 presented a theory of damages that would have permitted the Commissioner to recover lost profits as compensatory damages in the second phase of the trial. Form 7 was not essential to a finding of liability, and the parties agree that Form 7 could have been presented to the jury for the first time in the damages phase of the trial.[12]

In addition to Form 7, the NOLHGA Premise was incorporated into two jury instructions in the liability phase, Instructions 23 and 25,[13] which defined "reliance" and "harm" to the

---

[12]The Commissioner proposed Form 7 to satisfy his burden of proving that he would have obtained a profit but for the defendant's conduct, which is a predicate to receipt of lost profits as compensatory damages under California law. *See Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870, 883-84 (2002).

[13]*Instruction No. 23: Reliance*

The Commissioner relied on a misrepresentation or concealment if it caused him to:

(A)   select the Altus/MAAF bid instead of the NOLHGA bid and submit the Altus/MAAF bid to the Rehabilitation Court for approval and

(B)   also caused him to do at least one of the following:

(1) transfer either the junk bond portfolio or the insurance assets of ELIC; or

(2) not challenge the right of an entity to retain possession of either the junk bond portfolio or the insurance assets of ELIC.

*Instruction 25: Establishing Harm*

The Commissioner claims that the ELIC Estate was harmed by his selecting the Altus/MAAF bid instead of the NOLHGA bid. In order to find that the Commissioner was harmed, you must determine whether the Commissioner would have agreed to the NOLHGA bid had the alleged fraud not occurred and whether the Commissioner's acceptance of the Altus/MAAF bid caused the ELIC Estate to incur losses, costs or expenses that the ELIC Estate would not otherwise have incurred if the Commissioner had picked a "bonds in" bid.

ELIC Estate in terms of causing the Commissioner to select "the Altus/MAAF bid instead of the NOLHGA bid." Instruction 30, which defined the elements of conspiracy, however, contained a separate reference to harm that did not cross-reference Instruction 25: "The Commissioner claims that he was harmed by the [Altus/MAAF Group] that allegedly conspired to, and did obtain, ELIC's junk bonds and insurance business through fraud."[14] The district court orally instructed the jury that the set of instructions with "special application to the claim of intentional misrepresentation happens to be instructions 20 through 27," while the "conspiracy instructions are basically grouped in numbers 30 through 32."[15]

### 3. *Verdict Reconciliation*

The district court found that the verdicts could be reconciled. It held that "the structure and language of the instructions permit the inference that the jury reasonably could and

---

[14]*Instruction No. 30: Conspiracy-Essential Elements*

The Commissioner claims that he was harmed by the following companies that allegedly conspired to, and did obtain, ELIC's junk bonds and insurance business through fraud: Altus/Credit Lyonnais, MAAF, Omnium Geneve, SDI Vendome, and Financiere de Pacifique (Finapaci). The Commissioner contends that Artemis and Pinault are responsible for the harm because they joined those companies' alleged conspiracy to commit this fraud.

[15]The district court's oral instructions to the jury were:

You may wish to remember that the set of jury instructions that have special application to the claim of intentional misrepresentation happens to be instructions 20 through 27. So when you're trying to think of what your own position is and listen to your fellow jurors' position, you may want to have that set of pages from the jury instructions right out there, because they will tell you and use some of the very same language as the verdict form.

. . .

Now, conspiracy instructions are basically grouped in numbers 30 through 32 of the jury instructions. You may wish to keep that in mind.

did conclude that the definition of 'harm' for . . . Verdict Forms 1 and 3 (Instruction 25) was not applicable to Verdict Form 5 (Instruction 30)"; "the jury's responses to Verdict Forms 1 and 3 [finding no harm to the Commissioner] reflect that it found that the Commissioner did not prove that he would have picked the NOLHGA bid—as opposed to the Sierra bid—had Artemis not made a false representation and concealed a material fact"; "[t]hat is the same reason that [the jury] could not answer "yes" to Verdict Form 7; "in answering Verdict Form 5, the jury apparently and reasonably applied a broader notion of harm than that defined in Instruction 25 for the fraud claims—namely, that the scheme caused the Commissioner not to choose one of the bonds-in bids (either NOLHGA or Sierra)." The district court concluded: "Having found no harm in Verdict Forms 1 and 3, because the Commissioner had not proven that he would have picked the NOLHGA bid had he not relied on Artemis's misrepresentation and concealment, the jury again (and not surprisingly) was unable to find that the Commissioner would have picked the NOLHGA bid absent the scheme in Verdict Form 7."

The district court improperly construed the unanswered Form 7 as a failure of proof on the NOLHGA Premise. The cases are clear that no legal significance attached to the jury's failure to answer Form 7, and the district court should not have considered Form 7 when reconciling the answered verdict forms.[16] *See Iacurci*, 387 U.S. at 87. "[I]t was error in the

---

[16]The Commissioner and NOLHGA argue that the court granted a de facto judgment as a matter of law (JMOL) in favor of Artemis. *See Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 636 (6th Cir. 2005) (holding that the trial court "took the . . . issue out of the case, granting in effect judgment as a matter of law"). The district court's evaluation of the evidence informed its reconciliation of the verdicts:

The testimony given by the Commissioner Garamendi and his lieutenants as to why and how NOLHGA would have gotten the nod if Altus had not was so flatly at odds with what Mr. Garamendi said (and his aides did) in 1991 and thereafter as to be

face of the unanswered question for the trial court to thereaf-
ter 'go it alone' and dispose of the [issue]." *Union Pac. R.R.
Co.*, 219 F.2d at 831-32. Moreover, it is difficult to accept the
district court's reasoning in light of Form 7. If the jury had
found no harm in Forms 1 and 3 because it found that the
Commissioner would not necessarily have awarded NOL-
HGA the bid, then the jury should have easily answered "no"
on Form 7. That the jury could not do so suggests that the jury
had something else in mind, even if it was only confusion.

Although we disagree with the district court that the ver-
dicts compel judgment for Artemis, we also disagree with the
Commissioner and NOLHGA that the verdicts must be recon-
ciled in their favor. The Commissioner and NOLHGA argue
that Form 7 was superfluous because the jury conclusively
found in favor of the NOLHGA Premise in their answer to
Form 5. They reason that, in Form 5, the jury found that Arte-
mis' participation in the Altus/MAAF Group conspiracy
caused harm to the ELIC Estate; Instruction 25 provided the
only definition of harm in the jury instructions; and Instruc-
tion 25 defined harm in terms of the NOLHGA Premise. We
are not persuaded. As the district court found, the jury could
have reasonably believed that Instruction 30, which was the
instruction on proving harm resulting from conspiracy, was
broader than the definition in Instruction 25, which was the
instruction on harm for intentional misrepresentation and con-
cealment. Because Instruction 30 did not depend on the NOL-
HGA Premise, the jury could have found harm if it concluded
that the Commissioner would have entered a transaction with

      devoid of credibility. For that reason, I am convinced that no fair-
      minded jury would ever unanimously adopt the Commissioner's
      2005 version of history. Indeed, if the NOLHGA Premise were
      the basis of a Rule 50(b)(2) motion later on, I would grant it.

Despite that statement, the district court denied Artemis's motion for
JMOL. Without the benefit of a reasoned decision on that motion from the
district court, we decline the Commissioner and NOLHGA's invitation to
review the Post-Verdict Order as a de facto JMOL.

either of the "bonds-in" bidders, NOLHGA or Sierra, but for
the Altus/MAAF Group conspiracy.

Even if the jury applied the definition of harm in Instruc-
tion 25 in answering Form 5, a reasonable application of that
instruction would have permitted the jury to find harm with-
out accepting the NOLHGA Premise. Instruction 25 stated:

> The Commissioner claims that the ELIC Estate was
> harmed by his selecting the Altus/MAAF bid instead
> of the NOLHGA bid. In order to find that the Com-
> missioner was harmed, you must determine whether
> the Commissioner would have agreed to the NOL-
> HGA bid had the alleged fraud not occurred and
> *whether the Commissioner's acceptance of the Altus/
> MAAF bid caused the ELIC Estate to incur losses,
> costs or expenses that the ELIC Estate would not
> otherwise have incurred if the Commissioner had
> picked a "bonds in" bid* (emphasis added).

Ordinarily, when the word "and" appears in a list of require-
ments, it is conjunctive and indicates that all requirements
must be satisfied. If, for example, the instructions had read
"In order to find that the Commissioner was harmed, you
must find that the Commissioner would have accepted the
NOLHGA bid and that the Commissioner would have
incurred losses, costs or expenses . . . ," then the Commis-
sioner would have a strong argument. But Instruction 25
directed the jury to "determine" two questions; it instructed
the jury to answer the questions, not to link them. We think
a better reading of the instruction would have allowed the jury
to find the Commissioner was harmed if it determined either
that the Commissioner would have accepted the NOLHGA
bid or that the Commissioner would have incurred losses,
costs or expenses that the ELIC Estate would not otherwise
have incurred if the Commissioner had picked a "bonds in"
bid. NOLHGA and Sierra both submitted "bonds in" bids.
Thus, the jury could have found "losses, costs or expenses"

causing "harm" in Form 5 if it concluded that, but for the Altus/MAAF Group's conspiracy, the Commissioner would have selected either the Sierra or the NOLHGA bid. Because we cannot determine which of these conditions the jury found, the answered verdict forms do not establish the NOLHGA Premise conclusively.

[8] We thus conclude that, despite the district court's best efforts, the verdicts cannot be reconciled in favor of either side. The jury might have answered Form 7 in favor of either party. Since we cannot infer anything from the jury's silence, we are left with an indeterminate verdict.

4. *Remedy*

[9] The NOLHGA Premise was the Commissioner's principal damages theory and a vital issue in the trial. The jury's failure to answer Form 7 "left a gaping hole in the special verdict." *Union Pac. R.R. Co.*, 219 F.2d at 831. "To do other than send the case back for a new trial when decision on a vital issue by the jury is missing would deprive the parties of the jury trial to which they are entitled constitutionally." *Id.* at 832.[17] We reverse the Post-Verdict Order and remand for a new damages phase trial limited to proffer of the NOLHGA Premise and a determination of damages (including punitive damages), if any, on that theory. *See id.*; *Furr v. AT&T Techs., Inc.*, 824 F.2d 1537, 1545 (10th Cir. 1987) ("When special

---

[17]Artemis argues that resubmission of Form 7 to the jury in the damages phase after delivery of an *Allen* charge in the liabilities phase would have resulted in impermissible compulsion. *See Duk,* 320 F.3d at 1058 ("Resubmission . . . leaves open the possibility that the jury will reach an improper 'compromise' verdict[; h]owever, we presume that citizen jurors will properly perform the duties entrusted them and will not construe resubmission as an invitation to subvert the law and contort findings of fact in favor of a desired result."). On remand, the NOLHGA Premise will be posed to a new jury. As a result, the question of whether resubmission of Form 7 to the same jury after delivery of an *Allen* charge would have constituted impermissible compulsion is not before us.

interrogatories are submitted to a jury under Fed. R. Civ. P. 49(a) and the jury's responses do not provide an answer on a vital issue, then remand for a new trial is appropriate, at least as to the unresolved issue."); *see also Iacurci*, 387 U.S. at 87-88.

## III

### A. *Restitution Award of $241 million*

Artemis cross-appeals the district court's award of $241 million in restitution, arguing that the Commissioner had an adequate legal remedy, that the Commissioner failed to establish the elements for unjust enrichment and that the existence of an enforceable contract prohibits an award of unjust enrichment. In addition, Artemis argues that any award of restitution should be offset by settlements made by Artemis' co-conspirators under California Code of Civil Procedure Section 877.

**[10]** The district court calculated restitution in light of the jury's verdicts in the damages phase of the trial, which excluded proffer of the NOLHGA Premise. Because we remand for a new damages phase trial, we vacate the award of restitution. We grant the district court leave to reinstate that award, if warranted, at the close of trial. We decline to address the merits of Artemis' objections to the restitution award or to consider whether the offset provisions of Section 877 would apply to any restitution award made by the district court upon remand.

### B. *Denial of Summary Judgment on Res Judicata Grounds*

Artemis appeals the district court's denial of its motion for summary judgment under principles of res judicata. Artemis argues that the Commissioner's claims are an impermissible collateral attack on the Rehabilitation Plan, which was approved by the Rehabilitation Court on August 13, 1993.

In 1993, the "central issue before the court" was whether the Rehabilitation Plan was "fair, equitable, non-discriminatory and not arbitrary and provides opt outs with value equal to or greater than their ratable share of the current liquidation value of all of ELIC's assets at closing." The court also heard motions to rescind the sale of ELIC's junk bond portfolio to Altus on grounds of impossibility, mutual mistake, failure of consideration and breach of fiduciary duty. The Rehabilitation Court approved the Rehabilitation Plan and denied the motion for rescission. As a result of the Rehabilitation Court's *in rem* jurisdiction over the ELIC Estate, "[a]ll parties were forever enjoined from making any complaint with respect to the [Rehabilitation Plan] or any provisions thereof," and "even though the causes of action [are] different, the prior determination of an issue is conclusive in a subsequent suit between the same parties as to that issue and every matter which might have been urged to sustain or defeat its determination." *Pac. Mut. Life Ins. Co. v. McConnell*, 44 Cal. 2d 715, 724-25 (1955).

The Commissioner and NOLHGA were both parties to the Rehabilitation Court proceedings; however, the Commissioner did not learn of the Altus/MAAF conspiracy until 1999, six years after judicial approval of the Rehabilitation Plan. As a result, the issue of conspiracy liability was not litigated before the Rehabilitation Court. Res judicata would not bar the Commissioner's claims unless we accept Artemis' characterization of this litigation as a collateral attack on the Rehabilitation Plan.

Artemis relies principally on *In re Met-L-Wood Corp.*, a Seventh Circuit bankruptcy case, in support of that characterization. 861 F.2d 1012 (7th Cir. 1988). In that case, a trustee in bankruptcy filed a Federal Rule of Civil Procedure 60(b) motion to vacate a judgment confirming the judicial sale of a bankrupt corporation's assets. The trustee alleged a bid-rigging scheme to defraud the bankrupt corporation's unsecured creditors. The bankruptcy court denied the motion as

untimely. The trustee filed a complaint in federal district court seeking damages for fraud. The Seventh Circuit affirmed dismissal of that complaint on res judicata grounds, reasoning: "by seeking heavy damages from the seller, the purchaser, the purchaser's purchaser . . . , a law firm involved in the transaction, and the secured creditors that benefitted from the sale, the suit is a thinly disguised collateral attack on the judgment confirming the sale." *Id.* at 1018.

[11] Artemis argues by analogy: "By seeking to recover Artemis' profits, the Commissioner effectively seeks to revise the carefully articulated profit participation provisions of the Rehabilitation Plan that was approved by the Rehabilitation Court." Appellee's Reply Brief at 17.[18] We are not persuaded that the Commissioner's legal and equitable claims seeking disgorgement of Artemis' profit obtained through participation in the Altus/MAAF Group conspiracy to defraud the Commissioner are equivalent to revision of contractual profit participation terms embodied in the Rehabilitation Plan. The Commissioner does not seek rescission or modification of the Rehabilitation Plan; he seeks only to hold Artemis personally liable in law and equity for Artemis's intentional misrepresentation, concealment and participation in the Altus/MAAF Group conspiracy to defraud the Commissioner. Under the circumstances of this case, we conclude that the California Supreme Court would not construe the Commissioner's claims as a collateral attack on the Rehabilitation Plan. The district court properly denied Artemis' motion for summary judgment on res judicata grounds.

---

[18]California recognizes the public policy interest in finality of court-authorized sales in insurance rehabilitation proceedings. As stated by the Rehabilitation Court, "[A] lack of finality would chill sales of estate assets, as no one would bid for such assets if a sale could be undone months or even years later, simply because the asset in question had appreciated." *See also In re Met-L-Wood Corp.*, 861 F.2d at 1019. California also recognizes, however, a strong public policy interest in preventing a party from benefitting from his own fraud. *See*, *e.g.*, CAL. CIV. CODE § 3517 ("No one can take advantage of his own wrong.").

IV

We affirm the entry of judgment in favor of Artemis on the claims for intentional misrepresentation and concealment. We reverse the Post-Verdict Order and remand for a new damages phase trial limited to proffer of the NOLHGA Premise and a determination of damages (including punitive damages), if any, on that theory. We affirm the Order Re Punitive Damages, vacating the jury's $700 million punitive damages award under California law. We vacate the district court's $241 million restitution award with leave to reinstate, if warranted, at the close of the new damages phase trial.

Finally, we commend the district court for its heroic efforts to bring to closure a very complicated and lengthy trial and to find an equitable result. In the end, we reluctantly conclude that the district court was unsuccessful in reconciling the jury's answered verdicts with a single, unanswered verdict. We share the frustration of the district court and the parties that seventeen years after the failure of ELIC, fifteen years after final approval of the successful Rehabilitation Plan, and nearly ten years after the exposure of the fraud by the Altus/ MAAF Group and its investors, this litigation has not been brought to an end. Although we remand this case to the district court for further proceedings, we strongly urge the parties to reconsider their differences, and we again offer the services of the court's mediation unit. All parties shall bear their own costs on appeal.

AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART; REMANDED.