**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOSE FLORES; RYAN REYES; BRIAN PEREZ, *Plaintiffs-Appellees*, v. CITY OF WESTMINSTER; MITCHELL WALLER; ANDREW HALL; RON COOPMAN; KEVIN BAKER, in their individual capacities, *Defendants-Appellants*. | No. 14-56832 D.C. No. 8:11-cv-00278-DOC-RNB OPINION |

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted August 11, 2017
Pasadena, California

Filed October 11, 2017

Before: Jerome Farris, Consuelo M. Callahan,
and John B. Owens, Circuit Judges.

Opinion by Judge Farris

# SUMMARY*

## Employment Discrimination

The panel affirmed in part and vacated in part the district court's judgment, after a jury trial, in favor of three police officers of Latino descent who alleged discrimination and retaliation in violation of 42 U.S.C. § 1981 and the California Fair Employment and Housing Act.

The panel affirmed the district court's denial of the defendant City of Westminster's motions for a new trial and judgment as a matter of law on Officer Jose Flores's claim of retaliation in violation of FEHA. Viewing the evidence in the light most favorable to Officer Flores and drawing all reasonable inferences in his favor, the panel held that Officer Flores established that the City subjected him to one or more adverse employment actions, that his protected conduct was a substantial motivating factor behind the adverse employment actions, and that the City's proffered reasons for its actions were pretextual. The panel also affirmed the jury's award of damages to Officer Flores on the FEHA retaliation claim. The panel concluded that Officer Flores was not awarded a double recovery because the FEHA damages award did not necessarily overlap with the damages awarded against the defendant police chiefs for their individual retaliatory actions in violation of § 1981.

The panel held that the district court did not err in denying the officers' discrimination and retaliation claims

---

*This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

against the police chiefs under § 1981, which prohibits discrimination in the making and enforcement of contracts by reason of race. The panel held that California law providing that the employment relationship between the state and its civil service employees is governed by statute rather than contract should not be read to bar public employees from bringing claims under § 1981. The panel distinguished *Judie v. Hamilton*, 872 F.2d 919 (9th Cir. 1989), which predated the 1991 amendments to § 1981 expanding the reach of the statute's "make and enforce contracts" term.

The panel held that the district court did not abuse its discretion in evidentiary rulings. The panel held that there was no prejudicial error in allowing a jury instruction on the Uniform Services Employment and Reemployment Rights Act.

The panel held that the jury's verdict against two police chiefs for race discrimination in violation of § 1981 was not fatally inconsistent. In addition, the verdict finding the chiefs individually liable, and awarding punitive damages, was not against the clear weight of the evidence. The panel declined to reduce the punitive damages awards as unconstitutionally excessive.

The panel vacated the judgment against Chief Mitchell Waller, who died before trial, and remanded for the district court to grant two officers leave to substitute Chief Waller's estate pursuant to Fed. R. Civ. P. 25(a)(1).

**COUNSEL**

Justin Reade Sarno (argued), Steven J. Rothans, and Jill Williams, Carpenter Rothans & Dumont, Los Angeles, California, for Defendants-Appellants Mitchell Waller, Andrew Hall, Ron Coopman, and Kevin Baker.

Alison McIlvaine Turner (argued) and Timothy T. Coates, Greines Martin Stein & Richland LLP, Los Angeles, California; Leighton D. Henderson, Jeffery E. Stockley, and Melanie M. Poturica, Liebert Cassidy Whitmore, Los Angeles, California; for Defendant-Appellant City of Westminster.

Oliver B. Dreger (argued), Michael L. Kibbe, and Joseph M. Preis, Godes & Preis LLP, Irvine, California, for Plaintiffs-Appellees.

**OPINION**

FARRIS, Senior Circuit Judge:

Jose Flores, Ryan Reyes, and Brian Perez, three police officers of Latino descent (collectively, "Plaintiffs"), sued their employer and, after a nine-day jury trial, they won. The officers alleged that the City of Westminster ("the City" or "the Department") as well as current and former Westminster Police Chiefs Mitchell Waller, Andrew Hall, Ronald Coopman, and Kevin Baker ("the Chiefs"), discriminated and retaliated against them on the basis of race and national origin. As relevant here, the officers alleged causes of action for violation of the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code §§ 12900–12996, and 42 U.S.C. § 1981. Specifically, they

claimed they were denied special assignments that could increase their chances of promotion.  Officers Flores and Reyes also alleged that the defendants retaliated against them for filing administrative complaints, in violation of FEHA and 42 U.S.C. § 1981.

After reviewing the evidence, the jury largely sided with the officers, finding that: 1) the City had retaliated against Officer Flores in violation of FEHA; 2) Chiefs Coopman and Hall had racially discriminated against all three officers in violation of 42 U.S.C. § 1981; and 3) Chiefs Coopman and Waller had retaliated against Officers Flores and Reyes and Chief Baker had retaliated against Officer Flores in violation of section 1981.  The jury awarded the officers a total of $3,341,000.00 in general and punitive damages, and the court awarded $3,285,673.00 in attorney fees, $40,028.49 in expert fees, and $18,684.12 in costs.  The City and the Chiefs[1] appeal numerous aspects of the trial, the judgment, and the resulting award of fees and costs.  We affirm in part, and vacate and remand in part.

# I

Our review of this case is circumscribed by the evidence presented to, and the facts as found, by the jury.  The following evidence was adduced at trial:

## A.  Officer Jose Flores

Officer Flores was hired by the City of Westminster in 2002, after serving for ten years as a police officer with the

---

[1] Throughout this opinion we will refer to Appellants either as "the City" or "the Chiefs" in order to distinguish between the various points of appeal raised by each.  We will refer to the City and the Chiefs, collectively, as "Defendants."

City of South Gate. In 2004 or 2005, he applied for, but did not receive, a detective position with the fraud unit. He applied for one of three "motors" special assignments in 2006, but withdrew from consideration because he felt "demeaned" after the first two positions were awarded to others with less experience, and after he saw a sergeant asking another officer if she would be interested in testing out a motorcycle. In 2008, Officer Flores applied for, but did not receive, a domestic violence detective position, and in 2009 did not receive the juvenile detective position for which he applied. Again, he felt those positions were awarded to officers with less experience. Officer Flores received only one special assignment—a mall assignment—in twelve years with the Department. At times, he was called names by other officers, including "Dirty Sanchez," "Jorge," and "Silver" or "Silverback," and he was told that the gray streak in his hair was his "INS mark." In July 2010, Officer Flores filed an administrative complaint with the California Department of Fair Employment and Housing ("DFEH") in which he alleged discrimination on the basis of national origin. After that, he did not apply for further special assignments. On December 6, 2011, eighteen months after filing his first complaint, Officer Flores filed a second complaint with DFEH alleging retaliation.

According to Officer Flores, the following incidents were retaliation for his discrimination complaint:

- In November 2010, five months after Officer Flores filed his discrimination complaint, Chief Waller removed him from the list of available Field Training Officers ("FTO") (officers chosen to perform the collateral duty of mentoring and training new recruits).

- In June 2011, following an internal affairs ("IA") investigation, Officer Flores and Reserve Officer Phan received a written reprimand for failing to take reasonable action while on duty. The reprimand stemmed from a domestic violence call in April 2011 to which the officers did not respond, instead returning to the station to book evidence from a different crime scene. Although Officers Flores and Phan were the closest unit to the scene of the domestic violence incident, the dispatcher sent three other cars, and Officer Flores assumed those cars were closer than he was and that he did not need to respond. The incident resulted in serious injuries to the victim, and the perpetrator fled.

- In July 2011, Officer Flores received a Supervisor's Log entry[2] for a remark he made to a 14-year-old boy during a domestic violence call. As Officer Flores was working to deescalate the situation, he instructed the boy to go inside, whereupon the boy asked: "When did you become my dad?" Officer Flores responded: "I would not want to be your dad." The remark was deemed "mean spirited and discourteous," "not necessary," and "disrespectful."

- In June 2012, Officer Flores received a Supervisor's Log entry for his accidental discharge of a Taser during testing.

- In late 2013 or early 2014, Officer Flores was interviewed as part of an IA investigation into the failure to report criminal and/or policy violations,

---

[2] A Supervisor's Log entry documents verbal counseling given to an officer by a supervisor.

and was asked whether he was surreptitiously recording co-workers or knew of anyone doing so.

Before he filed his first DFEH complaint, Officer Flores had never been disciplined as a police officer or the subject of an IA investigation during his tenure with the City.[3] Officer Flores also continued to receive commendations after filing his DFEH complaints, and was chosen by Chief Baker in August 2012 to serve on a patrol advisory group. He received regular pay increases throughout his employment with the City.

### B. Officer Ryan Reyes

Officer Reyes was hired by the City in 1998 after graduating at the top of his class at the police academy, was named "Rookie of the Year," and performed collateral duties as an FTO and on the Department's SWAT team. Between 2002 and 2007, he applied for fourteen special assignments but received only a mall assignment. A more junior, white officer was selected over Officer Reyes as a narcotics detective,[4] despite feedback from some supervisors that the junior officer was not ready for the position. Another white officer, whom Officer Reyes had trained as an FTO, was selected over Officer Reyes for a detective position in 2009.

---

[3] Although the parties stipulated to this fact before trial, the record includes an Administrative Memorandum dated February 22, 2007, describing another instance of Officer Flores accidentally discharging his Taser during testing, for which he was verbally counseled on the proper handling, testing, and use of the Taser. The record does not indicate whether the memo constituted discipline, non-disciplinary verbal counseling, or simply administrative paperwork required when a Taser is discharged.

[4] Officer Perez also applied for, but did not receive, this position.

In January 2010, Officer Reyes filed a DFEH complaint alleging discrimination on the basis of national origin.

According to Officer Reyes, he suffered retaliatory actions after filing his discrimination complaint including Supervisor's Log entries, written reprimands, and a 10-hour suspension for late submission of daily logs, traffic citations, and an accident report. He was also placed into an IA investigation and disciplined in December 2010 for untimely booking of a pen into evidence, despite the fact that during the period of the delay Officer Reyes was away from the Department testifying in federal court in an unrelated work matter.

## C. Officer Brian Perez

Officer Perez, an officer in the U.S. Marine Corps Reserve, was hired by the City in January 2004. He performed collateral duties including serving as an FTO and on SWAT, and creating, formalizing, and serving on the Department's Honor Guard. Between 2004 and 2014, Officer Perez applied for, but was denied, twelve special assignments. In particular, on four occasions special assignments for which he applied were awarded to allegedly less-qualified white officers, one of whom had lied extensively on his resume. Officer Perez was also threatened with termination when Chief Hall believed Officer Perez was not testifying truthfully regarding a use of force incident involving another officer. That officer was ultimately cleared, but the charge that Officer Perez lied remained in his record with a finding of "not sustained" rather than a full exoneration, and he was removed from his SWAT and Honor Guard duties by Chief Hall. Officer Perez spent considerable time away from the Department fulfilling his duties with the Marine Corps, and the jury heard evidence

that he was not informed of potential openings within the Department while he was away on deployments.

## D.  Defendants

The City and the Chiefs disputed Plaintiffs' evidence and presented evidence that all officers, whether white, Latino, or Asian, had to apply numerous times before being promoted to Sergeant.  The jury heard testimony that eight sergeants applied between two and five times before receiving their promotions.  Defendants also presented evidence that at least seven officers identified by the City as Latino received special assignments between 2006 and 2013.

## II

We first address the City's contention that as a matter of law Officer Flores failed to establish his claim of retaliation in violation of FEHA.  After the jury returned its verdict, the City moved for a new trial and renewed its motion for judgment as a matter of law on this issue.  The record reflects that the district court properly denied both motions.

The district court's denial of a motion for a new trial is reviewed for abuse of discretion. *Martin v. Cal. Dep't of Veterans Affairs*, 560 F.3d 1042, 1046 (9th Cir. 2009).  We will grant a new trial only if the verdict is against the clear weight of the evidence, and not simply because the evidence might have led us to arrive at a different verdict. *Id.*  The denial of a renewed motion for judgment as a matter of law is reviewed de novo, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Id.*  "A renewed motion for judgment as a matter of law should be granted if the evidence permits only one conclusion and that conclusion is contrary to the jury's verdict." *Id.*  The district court's interpretation

of state law also is reviewed de novo.  *See Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 865 (9th Cir. 1996).

FEHA makes it unlawful to "discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden [by FEHA] or because the person has filed a complaint, testified, or assisted in any proceeding under this part."  Cal. Gov't Code § 12940(h).  To succeed on his FEHA retaliation claim, Officer Flores was required to show that the City subjected him to one or more adverse employment actions and that his filing of a DFEH complaint was a substantial motivating reason behind those actions.  *See Harris v. City of Santa Monica*, 56 Cal. 4th 203, 232 (2013); *Alamo v. Practice Mgmt. Info. Corp.*, 219 Cal. App. 4th 466, 479 (2013).  The City contends that none of its conduct with respect to Officer Flores constituted adverse employment actions under California law, that Officer Flores failed to prove his protected conduct was a substantial motivating factor behind those actions, and that Officer Flores failed to show that the City's proffered reasons for its actions were pretextual.

California defines adverse employment actions as those "materially affect[ing] the terms, conditions, or privileges of employment."  *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1052 (2005).  FEHA does not just protect against "adverse employment actions that impose an economic detriment or inflict a tangible psychological injury upon an employee."  *Id.*  Rather, "[a] discriminatorily abusive work environment . . . can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers."  *Id.* at 1053 (emphasis omitted) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1995)).  "[T]he phrase 'terms, conditions, or privileges' of employment must be interpreted

liberally and with a reasonable appreciation of the realities of the workplace in order to afford employees the appropriate and generous protection against employment discrimination that the FEHA was intended to provide." *Id.* at 1054. Actions that are "reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion fall[] within the reach of [FEHA's retaliation provisions]." *Id.* at 1054–55. Further, alleged acts of retaliation may be considered collectively to determine whether, taken together, they constitute an adverse employment action under the statute. *See id.* at 1055, 1060.

Here, the evidence at trial—viewed in the light most favorable to Officer Flores and with all reasonable inferences drawn in his favor—would permit a trier of fact to conclude he was subjected to adverse employment actions. After filing his DFEH complaint, Officer Flores was removed from the FTO list, received negative Supervisor's Log entries, and received his first written reprimand. Although the City argues that removal from the FTO list was a "relatively trivial incident" and the Log entries and reprimand did not impact Officer Flores's job duties or performance, the jury could infer otherwise from the evidence. For example, the jury was shown written supervisor feedback for officers seeking special assignments wherein their performance of collateral duties as FTOs was considered and discussed. The jury also saw supervisor feedback recommending against awarding a detective position to an officer because of performance issues. At the very least, the jury could infer that Officer Flores's removal from the FTO list, written reprimand, and negative Log entries would have been reviewed as part of any decision whether or not to award him special assignments or promote him, and would have harmed his prospects. *See Yanowitz,*

36 Cal. 4th at 1055; *see also Akers v. County of San Diego*, 95 Cal. App. 4th 1441, 1456 (2002) (negative evaluation and counseling memorandum constituted adverse employment actions because they potentially rendered employee "no longer 'promotable,'" or at least reduced her opportunities for promotion).  The jury's determination that the City subjected Officer Flores to one or more adverse employment actions was reasonable and not against the clear weight of the evidence.

The jury's finding that the filing of Officer Flores's discrimination complaint was a substantial motivating reason for the adverse employment actions taken against him likewise was reasonable and not against the clear weight of the evidence.  To establish a prima facie case of retaliation, Officer Flores was required to show that the adverse employment actions were linked to his protected activity. *See McRae v. Dep't of Corr. & Rehab.*, 142 Cal. App. 4th 377, 388 (2006).  This causal link "may be established by an inference derived from circumstantial evidence."  *Id.* Accordingly, Officer Flores could satisfy his initial burden "by producing evidence of nothing more than the [City]'s knowledge that [he] engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision."  *Id.* (citing *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 69 (2000)).  Here, it was undisputed that the City knew of Officer Flores's DFEH complaint.  And the first alleged adverse action by the City occurred in November 2010, five months after the DFEH filing, when Officer Flores was removed from the FTO list.

Without citation to any supporting case law, the City asserts this time period is too attenuated to establish

causation.[5]   However, we have held that, "[d]epending on the circumstances, three to eight months is easily within a time range that can support an inference of retaliation." *Coszalter v. City of Salem*, 320 F.3d 968, 977–78 (9th Cir. 2003) (declining to adopt "any bright-line rule about the timing of retaliation"); *see also Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (plaintiff made a sufficient prima facie showing where the adverse employment actions "began less than three months after he filed his first administrative complaint"); *George*, 179 Cal. App. 4th at 1492 (describing four months as "relatively close timing," from which supporting inferences could be drawn). Accordingly, the jury could conclude this evidence demonstrated the necessary causal link between Officer Flores's discrimination complaint and the subsequent adverse employment actions he suffered.

In light of this evidence, the City was "required to offer a legitimate, nonretaliatory reason for [its] adverse employment action[s]" in order to shift the burden back to Officer Flores to prove intentional retaliation. *Yanowitz*, 36 Cal. 4th at 1042. On this record, we are not convinced the City successfully countered Officer Flores's evidence, as it failed to provide a legitimate reason for at least one of the adverse employment actions it took against him. Specifically, the City provided no evidence explaining why Officer Flores was removed from the FTO list five months

---

[5] We are unpersuaded by the City's citation to *Fisher v. San Pedro Peninsula Hospital*, 214 Cal. App. 3d 590, 615 (1989), for the proposition that proximity in time for a prima facie case means "a relatively short time" between protected conduct and adverse action. *Fisher* does not analyze the timing issue at all, and at least one subsequent California case has held that a period of several months constitutes "relatively close timing." *See George v. Cal. Unemployment Ins. Appeals Bd.*, 179 Cal. App. 4th 1475, 1492 (2009).

after he filed his DFEH complaint. Instead, the City admits that "it seems to have happened," but that it was a "relatively trivial incident." Yet the jury could have found otherwise; as we note above, there is evidence in the record to support the view that removal from the FTO list affected Officer Flores's chances of receiving special assignments and promotions.

Regardless, the evidence presented by Officer Flores permits a finding of intentional retaliation by the City. For example, the jury heard testimony that workplace policies were inconsistently applied to Officer Flores—specifically, that Officer Flores was disciplined for his failure to respond to a domestic violence call while other officers who also failed to respond escaped discipline; and that Officer Flores received Supervisor's Log entries for discourteous language and for discharging a Taser, while others did not. *See Coszalter*, 320 F.3d at 978 (concluding a "reasonable fact finder could find from the inconsistent application of [an employment] policy that the defendants' motivation for enforcing the policy" was retaliatory). Further, evidence of a series of adverse employment decisions over the course of several years may "itself [be] probative of . . . the elusive factual question of [intent]." *Yartzoff*, 809 F.2d at 1377 (internal quotation marks omitted). Officer Flores presented evidence of alleged adverse employment actions spanning approximately three years, and the jury permissibly could have inferred from this evidence that the actions taken against Officer Flores constituted intentional retaliation.

Viewing the evidence in the light most favorable to Officer Flores and drawing all reasonable inferences in his favor, we affirm the district court with respect to Officer Flores's FEHA retaliation claim. To conclude otherwise would be "to intrude on the province of the jury," as this is

not a case where "a rational trier of fact could not find evidence in the record of . . . retaliation." *Winarto v. Toshiba Am. Elec. Components, Inc.*, 274 F.3d 1276, 1286–87 (9th Cir. 2001).

## III

Next, the City seeks a new trial on damages, arguing Officer Flores was awarded a double recovery. According to the City, the $150,000 the jury awarded to Officer Flores for the City's retaliation against him in violation of FEHA necessarily overlaps with the damages awarded against Chiefs Coopman, Waller, and Baker for their individual retaliatory acts in violation of 42 U.S.C. § 1981. Generally, we review a jury verdict of compensatory damages for substantial evidence. *See In re Exxon Valdez*, 270 F.3d 1215, 1247 (9th Cir. 2001). We reject the City's position here, as the verdict is not "hopelessly ambiguous" with respect to the damages awarded to Officer Flores, *Woodcock v. Fontana Scaffolding & Equipment Co.*, 69 Cal.2d 452, 457 (1968), but rather can be satisfactorily explained to avoid double recovery, *see Roby v. McKesson Corp.*, 47 Cal. 4th 686, 705 (2009).

As the district court noted: "The jury heard a wide range of evidence spanning many years, including conduct by many different employees of the Police Department. The Court is aware of no reason that the jury could not have identified conduct rendering the City liable [for retaliation in violation of FEHA] but not constituting personal participation or ratification by a Chief." For instance, the jury saw evidence that Officer Flores received a Supervisor's Log entry from Sergeant Knauerhaze for his accidental Taser discharge. Likewise, the Supervisor's Log entry for Officer Flores's discourteous remark to a teenage boy was written by Lieutenant Panella. Sergeant Vandergrift investigated

Officer Flores for his failure to respond to a domestic violence call, and Lieutenant Panella concurred with the resulting Administrative Report and recommended a written reprimand.  It is conceivable that the jury's verdict awarding $150,000 to Officer Flores from the City was for the retaliatory conduct of supervisors other than the Chiefs, and therefore does not overlap with the separate award of damages against the Chiefs in their individual capacities.

The City argues that whether this is actually what the jury intended "cannot be determined to a reasonable certainty" from the verdict and therefore a new trial on damages is required under *Roby*, 47 Cal. 4th at 705.  In *Roby*, however, the California Supreme Court explained that a new trial was required because even the plaintiff's proposed approach to interpreting the verdict so as to avoid double recovery created "an inconsistency" in the amounts actually awarded, and the plaintiff admitted there was "no *evidence* of an act of discrimination that [wa]s separate from her failure-to-accommodate and wrongful-termination claims." *Id.* at 704–05.  Here, by contrast, Officer Flores's proposed interpretation of the verdict does not create an inconsistency, and there is evidence in the record to support a finding that retaliatory acts were committed by other City employees in addition to the Chiefs.  Accordingly, *Roby* does not require a remand in this case.

When appellate courts review a verdict, "reasonable inferences may be drawn which will support rather than defeat a judgment." *Weddle v. Loges*, 52 Cal. App. 2d 115, 119–20 (1942).  We hold Officer Flores's $150,000 award against the City for FEHA retaliation may stand because substantial evidence permits "a correct interpretation" that avoids double recovery.  *Roby*, 47 Cal. 4th at 705 (quoting *Woodcock*, 69 Cal. 2d at 457).

**IV**

Moving next to the issues specifically raised by the Chiefs, we first address their argument that the district court erred in refusing to dismiss Plaintiffs' claims under 42 U.S.C. § 1981. We review questions of statutory interpretation de novo. *Ileto v. Glock. Inc.*, 565 F.3d 1126, 1131 (9th Cir. 2009). The district court's interpretation of state law likewise is reviewed de novo. *See Strother*, 79 F.3d at 865.

Section 1981 prohibits discrimination in the making and enforcement of contracts by reason of race, including color or national origin differences. 42 U.S.C. § 1981. "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* The Chiefs argue that because, under California law, the employment relationship between the state and its civil service employees is governed by statute rather than contract, Plaintiffs cannot seek recovery under section 1981. We disagree, and we hold—in a matter of first impression—that California law should not be read to bar public employees from bringing section 1981 claims in cases such as this one.

In *Judie v. Hamilton*, 872 F.2d 919, 922–23 (9th Cir. 1989), we outlined the proper analytical framework for determining whether a state public employee can recover under section 1981. In that case, a Washington state civil service employee claimed he was not permitted to perform all of the supervisory duties included in his job description. We examined whether state or federal law controlled the determination of the legal status of the plaintiff's job description. *Id.* at 922. As the language of section 1981 provides no specific guidance, we applied the Supreme

Court's three-step process, based on 42 U.S.C. § 1988, for borrowing an appropriate rule. *Id.* (citing *Burnett v. Grattan*, 468 U.S. 42, 47 (1984)).

First, we explained, courts must look to the laws of the United States "so far as such laws are suitable to carry [the civil and criminal civil rights statutes] into effect." *Id.* (quoting *Burnett*, 468 U.S. at 48). If, as here:

> no suitable federal rule exists, courts undertake the second step by considering application of state common law, as modified and changed by the constitution and statutes of the forum State. A third step asserts the predominance of the federal interest: courts are to apply state law only if it is not inconsistent with the Constitution and laws of the United States.

*Id.* (quoting *Burnett*, 468 U.S. at 48 (internal quotation marks omitted)). Following this procedure, we determined that under Washington law the plaintiff in *Judie* could not bring a cognizable claim for violation of the right to contract under section 1981. *Id.* at 923. We reach a different conclusion here.

Like Washington law, California law provides that "public employment is not held by contract but by statute." *Miller v. State of Cal.*, 18 Cal. 3d 808, 813 (1977). According to the Chiefs, *Judie* therefore dictates dismissal of Plaintiffs' section 1981 claims. But, as the district court recognized, the *Judie* decision predates the 1991 amendments to section 1981 expanding the reach of the statute's "make and enforce contracts" term following the Supreme Court's decision in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989). *See* 42 U.S.C. § 1981(b).

Moreover, in *Judie* we analyzed Washington rather than California law, and did not have occasion to consider the California Supreme Court's decision in *White v. Davis*, 30 Cal. 4th 528, 564–65 (2003), declaring that "a long line of California cases establishes that with regard to at least certain terms or conditions of employment that are created by statute, an employee who performs services while such a statutory provision is in effect obtains a right, *protected by the contract clause*, to require the public employer to comply with the prescribed condition." This language indicates a broader view of the applicability of section 1981 to public employees under California law than under Washington law at the time we decided *Judie*. *See* 872 F.2d at 923. California law weighs in favor of allowing Plaintiffs' section 1981 claims to proceed in this case.

The third step of the test set forth in *Judie*—assessing the predominance of the federal interest at stake—also leads us to conclude Plaintiffs' section 1981 claims are proper. The Civil Rights Act of 1866 implemented the Thirteenth Amendment, which was enacted with an intent to remedy "the most self-evident deprivation of slavery, the right to contract freely for one's labor." 2 Joseph G. Cook & John L. Sobieski, Jr., Civil Rights Actions ¶ 5.13 (Lexis-Nexis 1983 & Supps.). *See also Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 383–88 (1982) (summarizing legislative history of section 1981). Reading California law to bar all public employees from bringing section 1981 claims hinders a preeminent federal interest: preventing discrimination on the basis of race in the "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Such an interpretation of California law would be inconsistent with the Constitution and laws of the United States—specifically, with the 1991 amendment expansively defining the meaning of the term

"make and enforce contracts" in section 1981. In light of these considerations, we hold Plaintiffs' discrimination and retaliation claims were properly brought under section 1981.[6]

## V

The Chiefs next argue the district court erred by denying several of Defendants' motions in limine and by allowing submission of an instruction to the jury on the Uniform Services Employment and Reemployment Rights Act ("USERRA"). We review evidentiary decisions for an abuse of discretion. *Hill v. Rolleri*, 615 F.2d 886, 891 (9th Cir. 1980). Evidentiary errors will not lead to reversal absent some resulting prejudice. *Haddad v. Lockheed Cal. Corp.*, 720 F.2d 1454, 1459 (9th Cir. 1983). We review a district court's formulation of civil jury instructions for abuse of discretion in light of the instructions as a whole, *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1087 (9th Cir. 2005), and must determine whether any error was "more probably than not harmless," *Swinton v. Potomac Corp.*, 270 F.3d 794, 805 (9th Cir. 2001).

---

[6] We reject the Chiefs' alternative argument that because Plaintiffs were employed by the City rather than by the Chiefs, and because the jury did not find section 1981 liability against the City, the judgment against the Chiefs cannot stand. Numerous cases, including our own, have allowed individual liability under section 1981. *Cf. Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 711 (1989) (noting jury verdict finding individual supervisor violated plaintiff's rights under section 1981); *Bell v. Clackamas County*, 341 F.3d 858, 867 (9th Cir. 2003) (upholding jury verdict imposing individual liability against defendants under section 1981). *See also, e.g.*, *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) (collecting cases and holding that individual liability under section 1981 is permitted).

The Chiefs claim they were prejudiced by the district court's denials of motions in limine to exclude: 1) evidence of events that occurred outside of the statute of limitations period; 2) evidence of racial slurs used within the Department; 3) evidence of Sergeant Mize's alleged unprofessional emails to women and involvement with a co-worker and a bar employee; 4) evidence of Officer Turner's involvement with a bar employee; and (5) evidence of a prior discrimination claim from 1997 involving a "Whites Only" sign posted in the police station. The district court did not abuse its discretion in denying these motions.

Allowing the jury to hear evidence of Defendants' acts outside the statute of limitations was not reversible error. This evidence was relevant to Plaintiffs' claims that they were discriminated against under a custom or policy of the Department. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (explaining a statute of limitations does not "bar an employee from using the prior acts as background evidence in support of a timely claim"); *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1192 (9th Cir. 2003) (same).[7] Similarly, evidence regarding the alleged inappropriate conduct and resulting disciplinary histories of Sergeant Mize and Officer Turner was properly admissible because both men served as appropriate comparators to Plaintiffs for the jury. Each received special assignments and promotions despite serious violations of the Department's policies, and the district court did not abuse its discretion in finding their similarities with Plaintiffs

---

[7] *Cherosky v. Henderson*, 330 F.3d 1243, 1246 (9th Cir. 2003), cited by the Chiefs, addresses the "continuing violations doctrine" where the plaintiffs had not brought a pattern or practice claim, and does not stand for the proposition that evidence outside the statute of limitations cannot be admitted to support such a claim.

sufficient for the evidence to survive the balancing test under Federal Rule of Evidence 403. *Cf. Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) (explaining that "individuals are similarly situated when they have similar jobs and display similar conduct").

The district court denied the motions to exclude the evidence of racial slurs and the lawsuit stemming from the "Whites Only" sign without prejudice. The Chiefs did not renew their objections to the introduction of evidence on these subjects at trial, therefore their objections are waived. *See Palmerin v. Riverside*, 794 F.2d 1409, 1413 (9th Cir. 1986) (holding that unless a trial court's ruling concerning introduction of evidence is "explicit and definitive," an unsuccessful motion in limine must be renewed at trial to be preserved for appeal). Regardless, allowing the jury to hear this evidence was not an abuse of discretion, as in both instances the evidence was relevant to discriminatory intent, and to the City's knowledge, customs, and policies.

Finally, delivering a USERRA instruction to the jury was not prejudicial error. The instruction to which the Chiefs objected states:

### Military Leave

The Uniformed Services Employment and Reemployment Rights Act (USERRA) is a federal law that prohibits discrimination against service members and protects their job rights while in military service.

Under USERRA, a service member has the right to reemployment in the job position that the service member would have obtained with reasonable certainty if not for absence

due to uniformed service. USERRA also requires that a service member be treated the same way that the employer treats other employees on leave or furlough. The rights protected by USERRA can include the right to be notified of an open job opportunity.

There is no USERRA claim before you, and you are not deciding any questions associated with USERRA. You should consider any evidence about whether Westminster notified Plaintiff Perez of open job opportunities only in terms of the stated race discrimination claims.

The Chiefs argue this instruction left the jury "with the conflicted, uninformed impression that [Defendants] must have violated Perez's USERRA rights," and explains why the jury awarded Officer Perez more punitive damages than Officer Reyes even though Officer Reyes prevailed on more claims.

We conclude the USERRA instruction was more probably than not harmless. The instruction informed the jury it was *not* to consider Officer Perez's military service except to the extent the evidence demonstrated the City failed to notify Officer Perez of open job opportunities because of race discrimination.[8] Furthermore, the jury heard sufficient evidence from which it could have concluded that Chiefs Coopman and Hall discriminated against Officer

---

[8] Given Officer Perez's extensive testimony about his military deployments, the limiting instruction may actually have lessened the harm Defendants otherwise might have suffered from this potentially prejudicial line of testimony.

Perez absent any reference to his military service, including that he was denied twelve special assignments for which he applied between 2004 and 2014 and that Chief Hall removed Officer Perez from his SWAT and Honor Guard duties because he continued to believe Officer Perez was lying about a use of force incident. As for the difference in punitive damages awarded, the jury may have determined Officer Perez was entitled to greater damages because the Chiefs' actions against him were more egregious than those against Officer Reyes—for instance, the jury may have concluded that some of the actions taken against Officer Reyes were justified because of his prior poor record of turning in paperwork on time, or his relationship with a female officer that culminated in unproven rape charges and a reprimand for engaging in sexually explicit conversations at work. We affirm the district court's denials of the motions in limine and delivery of the USERRA instruction.

## VI

The Chiefs also seek a new trial because of what they claim are irreconcilable special verdict findings returned by the jury. They contend the jury's verdict against Chiefs Coopman and Hall for race discrimination in violation of section 1981 is fatally inconsistent because, while it includes findings that Chiefs Coopman and Hall personally participated in decisions to select non-Latino applicants with qualifications comparable to or worse than Plaintiffs', it does not include a finding of intentional discrimination. We review the district court's denial of a motion for a new trial for abuse of discretion, *Jorgensen v. Cassiday*, 320 F.3d 906, 918 (9th Cir. 2003), and its reconciliation of the special verdict form de novo, *California v. Altus Fin. S.A.*, 540 F.3d 992, 1004 (9th Cir. 2008). We conclude the district court properly denied the Chiefs' motion.

At the outset, we note the complexity of the verdict form presented to the jury in this case.  The Federal Rules of Civil Procedure provide for special verdicts (where the jury returns written findings on each issue of fact and the court then draws legal conclusions) or general verdicts with interrogatories (where the jury makes factual findings but also applies the law to those findings).  *See* Fed. R. Civ. P. 49(a), (b).  As the district court correctly noted, the jury form in this case falls somewhere between the two.  Like a special verdict form, it included a series of questions that referred the jury to answer further questions, or not, based upon their responses.  Nowhere did the form ask the jury to find "for" or "against" Plaintiffs or Defendants.  On the other hand, like with a general verdict with interrogatories, the jury was given lengthy instructions on the applicable law, setting out the elements and directing the jury how to apply those elements.  This suggests the jury was asked to apply law to its factual determinations, not just find facts.  *See Floyd v. Laws*, 929 F.2d 1390, 1395 (9th Cir. 1991); *cf. R. H. Baker & Co. v. Smith-Blair, Inc.*, 331 F.2d 506, 511 (9th Cir. 1964) ("Use of the special verdict eliminates the necessity for and use of complicated instructions on the law[.]") (internal citations and quotation marks omitted).  Whether interpreted as a special verdict or as a general verdict with interrogatories, however, the answers returned by the jury here do not require a new trial.

Significantly, the form posed questions to the jury in a cascading sequence, where some elements were presented with respect to one claim early in the form and then incorporated in later claims without repeating them.  Thus, the question of intent was presented to the jury in the portion of the form addressing the City's potential liability under section 1981, and the jury was instructed to answer that question only if it first found that Plaintiffs were

discriminated against due to a policy or custom of the City. The form next addressed the section 1981 claims against the individual chiefs, but did not repeat the question regarding intent. The jury ultimately found Chiefs Coopman and Hall had discriminated against Plaintiffs in violation of section 1981 without an explicit finding of intent, but this resulted from the parties' imperfect drafting of the jury form.

If we interpret the jury form in this case as a special verdict, the district court properly reconciled this alleged inconsistency in the jury's findings. Courts have a duty under the Seventh Amendment to harmonize a jury's special verdict answers, "if such be possible under a fair reading of them. A court is also obligated to try to reconcile the jury's findings by exegesis, if necessary." *Floyd*, 929 F.2d at 1396 (citing *Gallick v. Baltimore & O.R.R. Co.*, 372 U.S. 108, 120 (1963)). A new trial should be granted only "in the case of fatal inconsistency," *id.*, and in attempting to reconcile the verdict, the court must "view[] the case in any reasonable way that makes the verdicts consistent." [9] *Anheuser-Busch, Inc. v. John Labatt Ltd.*, 89 F.3d 1339, 1347 (8th Cir. 1996). Moreover, Rule 49(a)(3) of the Federal Rules of Civil Procedure provides that a party waives the right to a jury trial on any issue of fact raised by the pleadings or evidence but not submitted to the jury if submission is not requested before the jury retires to deliberate. "If the party does not demand submission, the court may make a finding on the issue. If the court makes no finding, it is considered to have

---

[9] We hesitate even to characterize the issue here as one of inconsistency. As the district court put it, "This is not a problem of inconsistency, per se; it is a problem of the parties developing a jury verdict form that did not present an element to the jury in both of the claims for which the Defendants wanted it presented."

made a finding consistent with its judgment on the special verdict." Fed. R. Civ. P. 49(a)(3).

Here, neither party requested a specific finding of intentional discrimination by the Chiefs in their individual capacities. Accordingly, it was not error for the district court to conclude that, "considered in light of [its] instructions to the jury," *Altus Fin.*, 540 F.3d at 1004 (citation omitted), including the instructions setting forth the elements of section 1981 discrimination claims,[10] the jury's failure to answer the question on intent in the portion of the jury form dealing with the City's liability merely indicated it intended to find the individual Chiefs liable, but did not find municipal liability under a custom or policy.

Alternatively, if we interpret the jury form as a general verdict with interrogatories, the Chiefs still are not entitled to a new trial. As the district court correctly concluded, the Chiefs waived any objection to the jury's allegedly inconsistent answers when they failed to object before the jury was discharged.[11] *See, e.g.*, *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1331 (9th Cir. 1995); *Kode v. Carlson*, 596 F.3d 608, 611 (9th Cir. 2010). We affirm the district court's denial of the Chiefs' motion for a new trial for alleged inconsistencies in the verdict.

---

[10] The jury instructions clearly stated that Plaintiffs were required to prove that Defendants intentionally discriminated, and included as an element that any purported legitimate business reason given by Defendants for their actions must be false.

[11] The parties were twice asked if they saw any reason the jury could not be discharged and did not object. *See L.A. Nut House v. Holiday Hardware Corp.*, 825 F.2d 1351, 1354–55 & n.3 (9th Cir. 1987) (discussing cases appropriately applying waiver).

**VII**

The Chiefs also moved for a new trial on the grounds that the jury verdict finding them individually liable was against the clear weight of the evidence and that Plaintiffs failed to present evidence of malicious conduct sufficient to support punitive damages. The district court declined to order a new trial on these grounds; we review its decision for abuse of discretion. *See Kode*, 596 F.3d at 611; *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999). "An appellate court generally will not reverse the denial of a new trial motion if there was some reasonable basis for the jury's verdict." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (internal quotation marks omitted).

The Chiefs properly can be held liable in their individual capacities: 1) if they participated in the deprivation of Plaintiffs' constitutional rights; 2) for their own culpable action or inaction in the training, supervision, or control of their subordinates; 3) for their acquiescence in the constitutional deprivations; or 4) for conduct that showed a reckless or callous indifference to the rights of others. *See Watkins v. City of Oakland, Cal.*, 145 F.3d 1087, 1093 (1998) (explaining instances in which a supervisor can be held individually liable). The jury heard evidence from which it could reasonably conclude that all four Chiefs either discriminated against or retaliated against Plaintiffs with malice, and we therefore uphold the jury's verdict.

The jury reviewed the following evidence that reasonably supports a finding that Chief Coopman retaliated against Officers Flores and Reyes in violation of section 1981:

- Chief Coopman oversaw multiple potentially retaliatory IA investigations against Officer

Reyes, and imposed a ten-hour unpaid suspension against him for submitting late reports, even though another officer testified that he frequently did not turn in daily logs on the day he worked without suffering any consequences, and that officers can hold collision reports without permission and submit them as they are completed. Chief Coopman also participated in the review hearing Chief Waller held for Officer Reyes.

- Chief Coopman opened an IA investigation against Officer Flores for failing to respond to a domestic violence incident and issued a written reprimand but did not investigate the dispatcher or other units who did not respond to the call.

Even though the evidence demonstrates Chief Coopman signed a commendation for Officer Flores, and testified that his wife is Hispanic and he does not discriminate against Latinos, the jury was free to accord this evidence whatever weight it saw fit, and the Court "cannot substitute its evaluations for those of the jurors." *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1084 (9th Cir. 2009) (internal quotation marks omitted).

The jury reviewed the following evidence supporting a finding that Chief Hall discriminated against all three Plaintiffs in violation of section 1981:

- Chief Hall, the "ultimate authority" regarding which officers received special assignments, repeatedly promoted white officers with serious disciplinary histories, as well as less qualified white officers, over Plaintiffs.

- Chief Hall issued a notice of intent to terminate Officer Perez based on his testimony regarding a use of force incident he witnessed and, although the charge was dropped, removed him from SWAT and Honor Guard, stopped assigning him FTO trainees, and would not give him a position on the Patrol Rifle Officer team.

- Chief Hall recommended that Officer Reyes receive a written reprimand for an unproven rape allegation, and authorized a written reprimand for entering into an ongoing inappropriate conversation between two white officers, but did not reprimand the white officers.

As for the finding that Chief Baker retaliated against Officer Flores in violation of section 1981, the jury was presented with evidence that:

- Chief Baker felt "sandbagged" by Officer Flores's DFEH Complaint, and thereafter refused to overturn the written reprimand Officer Flores received for his discourteous remark to a teenager.

- Chief Baker was in charge during the IA investigation into whether Officer Flores failed to report criminal and/or policy violations.[12]

---

[12] The evidence against Chief Baker admittedly is weaker than against some of the other defendants, but that is reflected in the jury's verdict finding him liable only for retaliation under section 1981 and awarding lesser damages against him. Again, we will not substitute our evaluation of the evidence for that of the jury. *See Tortu*, 556 F.3d at 1084.

The jury also was presented with evidence supporting its finding that Chief Waller retaliated against Officer Flores in violation of FEHA, and Officers Flores and Reyes in violation of section 1981, including that:

- Chief Waller removed Officer Flores from the FTO list five months after Officer Flores filed his DFEH complaint.

- Chief Waller was in charge during the period leading into the IA investigations of Officer Flores for failure to respond to a domestic violence call and for the discourteous remark he made to a teenager.

- Chief Waller was in charge when Officer Reyes filed his DFEH complaint in January 2010, and Officer Reyes was thereafter placed into multiple IA investigations and received discipline for infractions not enforced against other officers.

We conclude all of this evidence provided a reasonable basis for the jury's verdict against the Chiefs. Likewise, the jury's determination that clear and convincing evidence demonstrated the Chiefs' actions were malicious, oppressive, or in reckless disregard of Plaintiffs' rights was not against the great weight of the evidence. Accordingly, the district court did not abuse its discretion in allowing the jury's award of punitive damages to stand.[13]

---

[13] Additionally, the Chiefs argue the jury's failure to explicitly find intentional discrimination forecloses punitive damages, but we reject this argument for the reasons explained in Part VI, *supra*.

## VIII

Alternatively, the Chiefs seek a reversal or remittitur of the punitive damages awards against them as unconstitutionally excessive. We review whether punitive damages are excessive de novo. *Bains LLC v. Arco Prods Co., Div. of Atl. Richfield Co.*, 405 F.3d 764, 775 (9th Cir. 2005). We conclude the amount of punitive damages awarded in this case is not "grossly excessive" to the point of arbitrariness in violation of the Due Process Clause of the Fourteenth Amendment. *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 454 (1993).

Whether an award of punitive damages exceeds the bounds of due process is determined on a case-by-case basis by examining: (1) the reprehensibility of the conduct being punished; (2) the ratio of the punitive damages award to the compensatory damages award; and (3) the difference between the punitive damages award and the civil penalties authorized or imposed in comparable cases. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568, 575, 580–83 (1996). The degree of reprehensibility of the conduct at issue is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." *Id.* at 575. The Chiefs argue that several of the punitive damages awards in this case exceed a 4:1 ratio, which "might be close to the line of constitutional impropriety." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003).[14] The punitive damages awarded here do not cross that line.

First, the Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple

---

[14] A chart setting forth the damages awarded to each plaintiff is included in an appendix to this opinion.

mathematical formula," *BMW*, 517 U.S. at 582, and the single-digit ratios here are in line with our precedent. *See, e.g.*, *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1044 (9th Cir. 2003) (upholding a 7:1 ratio and noting "[w]e are aware of no Supreme Court or Ninth Circuit case disapproving of a single-digit ratio between punitive and compensatory damages"); *Swinton*, 270 F.3d at 818–19 (upholding a ratio of 28:1 and noting that "where the injury is primarily personal, a greater ratio may be appropriate" (citation omitted)).

Second, we have recognized that intentional discrimination on the basis of race or ethnicity is especially reprehensible and "a different kind of harm, a serious affront to personal liberty." *Zhang*, 339 F.3d at 1043 ("There can be no question of the importance of our society's interest in combating discrimination; this nation fought the bloodiest war in its history in part to advance the goal of racial equality, adding several amendments to the Constitution to cement the battlefield victory."); *see also Swinton*, 270 F.3d at 817–18. Accordingly, a more substantial punitive damages award may be justified in intentional discrimination cases than in cases involving "purely economic" harms. *Cf. BMW*, 517 U.S. at 576.

As to the third factor, we observed in *Swinton* that "[t]here are no 'civil penalties' for the type of conduct for which [Defendants were] held liable in this case." *Id.* at 820. While Title VII's damages cap of $300,000 may sometimes serve as a guidepost, "Congress has not seen fit to impose any recovery caps under § 1981 . . . , although it has had ample opportunity to do so since the 1991 amendments to Title VII." *Id.* And in any event, only a few of the punitive awards here are in excess of $300,000, and only the awards against Chiefs Coopman and Hall significantly so. On

balance, the differential between the compensatory and punitive damages is not so large as to be constitutionally excessive on the facts of this case. We decline to reduce the jury's punitive damages awards.

## IX

The final issue we must decide is whether the verdict against Chief Waller is valid notwithstanding the fact that he died before trial. Waller was the City's Chief of Police from January 2010 to March 2011. On June 28, 2013, he was struck and killed by a motorist while riding his bicycle. It is undisputed that the parties knew of Chief Waller's passing; the proposed Final Pre-Trial Conference Order filed in November 2013 indicated in a footnote that, "Defendant Mitchell Waller is recently deceased." Likewise, it is undisputed that no statement of death was served on any party or Chief Waller's estate, and that neither party filed a motion to substitute the estate as the defendant under Rule 25(a) of the Federal Rules of Civil Procedure.[15] The jury assessed a total of $466,500 against Chief Waller for retaliating against Officers Flores and Reyes in violation of section 1981—$395,000 was compensatory and $71,500 punitive.

---

[15] Federal Rule of Civil Procedure 25(d), providing for automatic substitution of a decedent's successor when a decedent is sued in his official capacity, does not apply here. An individual official's actions in violation of federal law cannot establish liability in an official capacity action; instead, a governmental policy or custom must be the "moving force" behind the official's unlawful actions. *See Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658, 694 (1978). But the jury found in this case that the discrimination suffered by Plaintiffs was not due to a custom or policy of the City. Accordingly, Chief Waller was found liable only in his individual capacity.

Rule 25(a)(1) allows any party to move for substitution in the case of a party's death, within ninety days of filing a statement of death on the record, provided the underlying "claim is not extinguished." Section 1988 directs courts to apply state survival laws in civil rights actions when not inconsistent with the Constitution and federal law. *See Robertson v. Wegmann*, 436 U.S. 584, 588–90 (1978) (holding the survivability of section 1983 claims is governed by state law). State law therefore governs the survivability of section 1981 claims. In California, no cause of action is lost "by reason of" a defendant's death, as long as the statute of limitations for the claim has not expired and the claim is filed against the decedent within a year of death. Cal. Civ. Proc. Code §§ 377.20, 366.2. Thus, the section 1981 claim against Chief Waller survives because it was timely filed before his death.

Complicating matters, however, is the fact that Rule 25(a)(1)'s ninety-day period to move for substitution of the estate was never triggered in this case because no party filed and served a formal statement noting Chief Waller's death. *See Barlow v. Ground*, 39 F.3d 231, 233 (9th Cir. 1994); *see also* Fed. R. Civ. P. 25(a)(3).[16] And the Chiefs contend that because more than a year has passed since Chief Waller's death, it is now too late to substitute his estate under

---

[16] The incidental reference to Chief Waller's death in the parties' pre-trial conference order was insufficient to constitute a formal statement of death. *See, e.g.*, *Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 595 F. Supp. 326, 330 (N.D. Cal. 1983) *aff'd on other grounds*, 781 F.2d 1393 (9th Cir. 1986) (incidental mentions of death in the interrogatories were insufficient to establish a formal statement of death on the record); *see also Blair v. Beech Aircraft Corp.*, 39 Fed. R. Serv. 2d 1410 (W.D. Pa. 1984) *aff'd without opinion*, 787 F.2d 580 (3d Cir. 1986) (a passing reference to death in the pleadings was insufficient).

California Code of Civil Procedure section 366.2. We note, however, that California courts may grant leave to amend a complaint to name a decedent's estate, even where that amendment occurs after the expiration of the one-year period in section 366.2. *See Burgos v. Tamulonis*, 28 Cal. App. 4th 757, 761–63 (1994). Accordingly, we reject the Chiefs' argument that a remand to the district court for substitution of Chief Waller's estate under Rule 25(a) would be futile.

The Chiefs also argue, however, that Officers Flores and Reyes are time-barred from seeking recovery from Chief Waller's estate under the requirements of the California Probate Code. Enforcement of federal judgments, they correctly point out, is subject to procedures in the forum state. *See* Fed. R. Civ. P. 69(a); *Duchek v. Jacobi*, 646 F.2d 415, 416 (9th Cir. 1981). In California, surviving causes of action may be continued against a decedent's personal representative, subject to the requirements of section 9000 et seq. of the California Probate Code. *See* Cal. Civ. Proc. Code §§ 377.40–41. Probate Code section 9370(a) in turn states that actions or proceedings pending against a decedent "may not be continued against the decedent's personal representatives" unless: "(1) A [probate] claim is first filed as provided in this part"; "(2) The claim is rejected in whole or in part;" and "(3) Within three months after the notice of rejection is given, the plaintiff applies to the court in which the action or proceeding is pending for an order to substitute the personal representative in the action or proceeding."

On this record, we cannot determine whether the provisions of the Probate Code bar recovery of Plaintiffs' claims against Chief Waller's estate. The parties have provided no evidence indicating whether administration of the estate was ever initiated or whether Officers Flores and Reyes filed a claim. Accordingly, we vacate the judgment

against Chief Waller and remand to the district court to grant Officers Flores and Reyes leave to substitute the estate, provided they properly follow the procedures set forth in Rule 25(a). The district court may then—after reviewing additional evidence submitted by the parties as necessary—determine whether Officers Flores and Reyes can recover damages from Chief Waller's estate.

On remand, the district court also should determine in the first instance whether Plaintiffs may recover from the estate the punitive damages awarded against Chief Waller, or whether the parties waived any argument regarding those damages by not raising the issue before trial. The general rule in California is that punitive damages are not recoverable against a decedent's personal representative. *See* Cal. Civ. Proc. Code § 377.42 ("In an action or proceeding against a decedent's personal representative . . . on a cause of action against the decedent, all damages are recoverable that might have been recovered against the decedent had the decedent lived except . . . punitive or exemplary damages.").[17] Here, however, the parties put the question of whether to award punitive damages against Chief Waller to the jury, all the while knowing full well that Chief Waller had died almost seven months before the trial began. The district court may review any additional evidence submitted by the parties on this issue and decide, on the

---

[17] Plaintiffs argue California courts have at times permitted exceptions to this rule, however in those cases, the decedent died after the case had reached final judgment. *See Whelan v. Rallo*, 52 Cal. App. 4th 989, 991–95 (1997) (citing California cases and statutes supporting the proposition that punitive damages awards are only enforceable if the defendant dies after final judgment). In this case, Chief Waller died over a year before the district court entered judgment.

unique facts of this case, whether or not it will allow the punitive damages award against Chief Waller to stand.

## X

For the reasons set forth above, we **AFFIRM IN PART, AND VACATE AND REMAND IN PART.**

Each party shall bear its own costs.

**APPENDIX**

| Defendant | Plaintiff | Punitive | Compensatory | Ratio |
|---|---|---|---|---|
| Coopman | Flores | $396,000 | $218,000 | 2:1 |
| Coopman | Reyes | $176,000 | $40,000 | 4:1 |
| Coopman | Perez | $308,000 | $50,000 | 6:1 |
| Hall | Flores | $459,000 | $65,000 | 8:1 |
| Hall | Reyes | $220,000 | $45,000 | 5:1 |
| Hall | Perez | $385,000 | $100,000 | 4:1 |
| Baker | Flores | $49,500 | $42,000 | 1:1 |
| Waller | Flores | $49,500 | $210,000 | 1:4 |
| Waller | Reyes | $22,000 | $185,000 | 1:8 |